**SPEYER, INC. and Yellow Cab Company of Erie**

v.

**HUMBLE OIL & REFINING COMPANY and A. O. Smith Corporation.**

**C. A. 1177.**

United States District Court
W. D. Pennsylvania.

Oct. 18, 1967.

John G. Gent, and William Knox, Erie, Pa., on behalf of Speyer and Yellow Cab, plaintiffs.

Cloyd R. Mellott, Pittsburgh, Pa., and John M. Wolford, Erie, Pa., on behalf of Humble, defendant.

Raymond G. Hasley, Pittsburgh, Pa., on behalf of A. O. Smith Corporation, defendant.

Bernard McAuley, Pittsburgh, Pa., on behalf of Rockwell, third party defendant.

Richard H. Scobell, Erie, Pa., on behalf of Jabe, third party defendant.

OPINION

WILLSON, District Judge.

Henry W. Buhl has been engaged in the taxicab business in the City of Erie in this District since 1935. Under the Public Utility Laws of Pennsylvania, he operates Yellow taxicabs. But to garage and to maintain his cabs, he formed the corporation, plaintiff Speyer, which owns the building. The cab business is owned by plaintiff Yellow Cab. Mr. Buhl owns all of the stock of both corporations except for nominal shares, and was and is the force behind the operation of both plaintiffs.

On April 24, 1964 a disastrous gasoline fire occurred on plaintiffs' premises which destroyed the building and over 65 taxicabs as well. Suit was filed on December 31, 1964. The diversity jurisdiction of the Court was invoked. The case came on for disposition non-jury. Throughout the pretrial stages, the issues appeared complex. Some 8 hearings were had on discovery and other motions prior to trial. Several third party defendants were added of record. However, it was decided that the issue of liability only against Humble and A. O. Smith should first be tried. During a 12 day trial some 2,063 pages of testimony were taken and transcribed. It is believed that a recital of but the essential facts which appear in this extensive record is necessary to an understanding of the case and greatly simplifies it.

In the mid-1940's, plaintiff Speyer purchased a building at 117 East Tenth Street in Erie, and in consultation with the architects and builders the management of Speyer remodeled that building, including the installation of a wall at the proposed location of a gasoline pump. Humble had nothing whatever to do with this remodeling. After this remodeling, Yellow Cab began to utilize that building as a garage for its taxicab operation.

Humble is a major supplier of gasoline and oil products and does business in the Erie, Pennsylvania area. For some time prior to April 1954 when Humble lost the Yellow Cab account to Cemico, Humble furnished gasoline to Yellow Cab at the plaintiffs' garage.

After Cemico started to supply gasoline to the plaintiff enterprise, Cemico in April 1954 purchased from Erie Meter Systems and installed in the plaintiffs' garage a #910 pump. The Erie pump was selected by J. T. Harper, the President of Yellow Cab, and Humble had nothing whatever to do with its selection, purchase or installation. Installation of the Erie pump was on the east side of a wall located inside the garage which had been constructed by the plaintiff enterprise as a part of the remodeling previously referred to. A pipe extended from the pump and through this wall to the west side thereof, where a gasoline hose and nozzle used to dispense the product was located. The Erie pump was leased by Cemico to the Yellow Cab following its installation in April 1954.

On October 1, 1955 Yellow Cab changed its source of gasoline back to Humble. Yellow Cab purchased from Cemico the gasoline dispensing equipment, including the Erie pump, used to

store and dispense gasoline at the plaintiffs' garage. Humble as an accommodation to the business purchased this equipment from Yellow Cab and leased it back under an Equipment Lease dated November 1, 1955. No rental was paid under this Equipment Lease.

That Equipment Lease contained a provision under which Humble agreed to make certain repairs to the leased equipment upon written notice from the plaintiff enterprise and upon certain other conditions. Prior to 1959, those repairs were made either by Humble employees or independent service contractors, including Jabe, hired by Humble from time to time on a specific request basis.

Then in 1959 Humble entered into an Area Maintenance Agreement with Jabe. Jabe was the best pump service contractor in the Erie area and the contractor who for several years had made repairs to the service station equipment, including gasoline pumps, for Humble under a Contract Mechanics Specific Request Agreement, at service stations selling, and at customer locations using Humble gasoline and other petroleum products. Among the equipment to be serviced by Jabe under this agreement was the gasoline dispensing equipment, including the Erie pump, located at the plaintiffs' garage. Jabe pursuant to its agreements with Humble made numerous service calls to the plaintiffs' garage repairing damage to the pumps and inspecting them. The evidence showed that for several years from time to time the hoses attached to the gasoline pumps became damaged. The damage occurred because of the method of operation by Yellow Cab employees. The routine followed was that an incoming driver going off duty filled the tank of his cab with gas prior to checking in his cab fare and quitting his shift. But plaintiffs employed no attendants to fill the gasoline tanks of the cabs. Each driver performed this task for his cab. The cabs came off the street at 8 hour intervals and lined up at pump or pumps awaiting their respective turn at the pump.

Hose trouble frequently occurred because the drivers would drive off with the nozzle of the hose still in the tank thus stretching and pulling the hose and occasionally catching the hose on bumpers of the cabs. Humble through Jabe made the repairs when necessary and when called upon by Yellow Cab. Finally in October 1963 Jabe installed on the Erie pump a Flexsteel hose manufactured by Goodyear. This hose, which had Underwriters' Laboratories approval was used by Jabe only at problem locations where a heavy duty hose was needed or when requested by a customer. This hose was made of a steel, wirebraid construction. Several companies other than Goodyear, including U. S. Rubber and B. F. Goodrich, have manufactured and marketed a similar gasoline hose for many years. This type of gasoline hose was first approved by Underwriters' Laboratories in 1957 and the Goodyear Flexsteel brand of this hose was initially approved in early 1960.

On April 20, 1964, a cab driven by Arthur Locke, a Yellow Cab driver, after refueling at the Erie pump and in maneuvering to go up a ramp, hooked the hanging hose of the Erie pump with the cab bumper and pulled and stretched the hose as the cab was driven away. Shortly thereafter, gasoline was observed on the floor of the Yellow Cab garage. The gasoline was promptly cleaned up and no fire ensued. Inspection of the Erie pump by Yellow Cab personnel revealed that the meter cover casting, located inside the Erie pump, was cracked. Yellow Cab shut down the Erie pump, removed it from operation and called Jabe. The following morning, John Elmer, Jr., of Jabe, made the necessary repairs by replacing the entire meter unit, including the meter cover casting, of the Erie pump. Mr. Elmer, Jr., then made the usual inspection and operating tests on the Erie pump, which showed that the valves of the pump were clean and operating properly; that the other parts of the pump were operating properly; and that the pump was not leaking gasoline. Thereafter, the Erie pump was

placed back in operation, and it worked properly until the incident eight days later.

On April 29, 1964 a cab driver named Charles Southward, after completing his work shift, pulled up to the Erie pump to refuel his cab. To do this, Southward placed the nozzle of the hose in the gasoline filler pipe of the cab and "hooked it in" so that it would not fall out of the tank. An advertising sign was mounted on the rear of the cab with the bottom of the sign below the level of the filler pipe. Consequently, it was necessary for Southward to move the sign in order to insert the nozzle in the filler pipe of the cab. After inserting the nozzle, Southward, following the practice of all the drivers, hooked the nozzle in the tank by placing the ad sign on top of the nozzle and perhaps by some other method. Southward then worked on his report inside his cab while the refueling proceeded. Southward was in a hurry to leave since he had a date and wanted to get a "quick beer". In any event, when the nozzle shut off, he forgot to remove it from the tank and drove off several car lengths with the nozzle in the tank, stretching the hose tight and giving it a violent jerk. This jerk was sufficient to severely distort in the direction of the pull, the pipe coupling to which the hose was attached.

Although the nozzle was automatic in that it shut off the flow of gas when the tank became filled, thereby allowing the driver to leave the vicinity of the tank while refueling, the nozzle had a spout without any spring or other deice on it which would permit it to remain in the filler pipe without some external retaining force. Defendants contend that the drivers hooked the advertising sign over the nozzle to keep the spout in the filler pipe of the gas tank. Plaintiffs deny this practice. There is considerable uncertainty in the record as to the component parts of the nozzle which were attached to the hose on April 29th, as this nozzle was not found after the fire. However, the evidence favors defendants' contention.

Despite the fact that most of the employees of Yellow Cab who witnessed this incident on April 29th were aware of the Locke incident of April 20th and the damage it had done to the pump, and the gasoline leakage which had then occurred, no one took a look at the Erie pump after the Southward incident to see if it had been damaged or if it was leaking gasoline. Instead, another driver, named Lee, who, at the time Southward was refueling, was waiting immediately behind Southward to refuel and who had observed the hose being jerked by Southward driving away with the hose in the tank of his cab, pulled his cab along the Erie pump, turned the pump on and placed the nozzle into the tank of his cab, putting the nozzle on the automatic position. After the pump had been running for 3 or 4 minutes, although it was not delivering gasoline to Mr. Lee's cab, another Yellow Cab employee, Charles Siebold, chanced by the Erie pump and discovered gasoline on the floor in the vicinity of the pump. He then shouted a warning; but before effective action could be taken, the gasoline ignited and the subsequent fire damaged or destroyed the physical and real property located at the garage. After the fire, a crack was noted in the meter cover casting which had been installed on the Erie pump on April 21, 1964 by John Elmer, Jr. This crack was similar in appearance to that found in the meter cover casting involved in the April 20, 1964 incident.

## ALLEGED NEGLIGENCE OF DEFENDANT HUMBLE

There is no divergence of opinion between the parties as to how the accident happened. As plaintiffs state in their post-trial brief,—"All parties to this case agree that internal pressure was created in the system and that the system, on the date of the accident, was incapable of relieving the pressure." However, this seeming concord on the *how* of the accident merely points up the great dispute on the *why* of the accident. From the outset of litigation, and throughout their portion of the trial,

plaintiffs contended that the pressure build-up was caused by a malfunctioning pressure relief valve and that this in turn was the result of improper maintenance by Humble. Plaintiffs' expert, John Crankshaw, expressed this opinion in his testimony and explained the basis for it as follows. The meter head casting was of Class 15 or Class 20 cast iron, which had a tensile strength of 15,000 or 20,000 psi respectively. The static pressure required to fracture a casting under laboratory conditions was approximately 500 psi. Similarly, under laboratory conditions, with the pressure relief valve rendered inoperative, pressures of the magnitude of 150–175 psi could be obtained in the meter head by rapidly opening and closing the hose nozzle valve. Since the gaskets in the pump assembly would leak at 250 psi or less, Mr. Crankshaw reasoned that the meter head casting fracture was not the result of any single pressure surge, but was rather the result of material fatigue, i. e., the cumulative result of numerous repetitive pressure surges. Using stress analysis to explain the material fatigue theory of the casting fracture, Mr. Crankshaw explained that the cast iron of the type used in the casting, had an endurance limit of 8000 psi, that is, it could withstand repeated stresses of that magnitude without ultimately failing, but if a stress greater than that were produced, the number of times it could be produced without resulting in material failure would be finite and the casting would ultimately fracture. Taking the surge pressures of 100–175 psi, Mr. Crankshaw computed the resulting stress to be 4000–7000 psi, or in surges, double that or 8000–14000 psi, beyond the endurance limit. Since pressures of the magnitude of 100–175 psi were impossible to obtain under normal operating conditions with all relief valves functioning properly, and since such pressures could be obtained by rendering the relief valves inoperative, Mr. Crankshaw concluded that the casting was fractured because the relief valves were inoperative, and that they were inoperative because of accumulations of foreign materials which proper maintenance would have prevented.

Mr. Crankshaw's testimony in chief was impressive and convincing in its application of engineering principles to the facts of the case. Had this been all that there was to the case, the effect of it would have tended toward imposing liability upon Humble for improper maintenance. However, after persistent and exhaustive cross-examination had been conducted by Humble's counsel, this Court was left with two impressions: first, that the engineering bases for plaintiffs' theory of liability were not as bedrock sound as they first appeared, and second, that defendants were not going to be content merely with refuting plaintiffs' theory but were prepared to propose a theory of their own. In short, had the plaintiffs' case depended solely on their evidence, this Court would have found difficulty in rendering a judgment in their favor.

Defendants' theory of the case rests upon a fact given little weight by the plaintiffs. Noting that preceding each instance of casting fracture, the hose had been subjected to a violent jerk, Humble formulated the theory that it was the jerk, and not the inoperative valves, which caused the casting fractures. Using a pumping assembly and piping constructed to similate the conditions which obtained at the Yellow Cab garage, defendants demonstrated to the Court that even in a properly maintained and cleaned pumping assembly, with all valves thereby presumably operative, the meter head casting could be fractured simply by having a man stretch the hose to its full length and give it a sharp jerk. Defendants' experts explained this phenomenon by reference to the physical characteristics of the hose installed on the pump at the Yellow Cab garage and at the demonstrations. The hose, a Goodyear Flexsteel brand, is constructed of wire braid encased in rubber, which gives it greater strength and resistance to crushing, as when driven over by an automobile. As indicated, defendants' witnesses testified that this hose

had been installed on the pump at the Yellow Cab garage because the abuse given other hoses had resulted in their being crushed and unsuitable for use. A peculiar characteristic of this hose, however, defendants' experts testified, was that because of the wire mesh construction, the bore of the hose, when stretched, tended to decrease at a rate greater than the length increased, resulting in a sharp reduction of volume and corresponding sharp increase in pressure, which, when transmitted back along the pipe to the meter head casting, caused the fracture.

■ Defendants' evidence tended strongly to exonerate them of any negligence based on improper maintenance. The demonstrations, while not conclusively establishing the cause of the casting fracture which precipitated the fire, are more persuasive than plaintiffs' theory, unsupported as it was by any evidence that the valves in fact were inoperative because clogged, and questioned as it was by defendants' undercutting its engineering soundness. The contention of the defendants, that the fracture was caused by a sudden jerk on the hose and could be caused thereby even under optimum working conditions, is entitled to more credibility and hence to be accorded more weight in formulating the decision of this Court. Plaintiffs' argument, that if a casting in a properly maintained pump could be fractured by a jerk, a casting in an improperly maintained pump could be fractured more easily, assumes its conclusion and is at any rate speculative. It is the finding of this Court, based on all the evidence, that plaintiffs have failed to meet their burden of proof on the issue of Humble's negligence based on improper maintenance.

■ At this juncture, plaintiffs have chosen to adopt another theory of negligence and base their theory on all the evidence, including defendants', as it is their right so to do. Under this theory of negligence, plaintiffs contend that Humble was negligent in installing a Flexsteel hose on the pump when it knew or should have known of the probable consequences of such an installation. They argue that the tendency of the hose bore to decrease sharply and the internal pressure to increase correspondingly when the hose was jerked created an unsafe condition which would have become evident had Humble adequately tested such an assembly before authorizing the installation of the Flexsteel hose on the pump at the Yellow Cab garage. The answer to this argument lies in a consideration of the duty of Humble to exercise a reasonable degree of care in its maintenance of the gasoline pump on the plaintiffs' premises. Testimony showed the following: The pump and meter assembly was of a type which had been manufactured and in use throughout the industry since the 1930's. Underwriters' Laboratories approval had been given to this type of assembly from the beginning. The Flexsteel hose, manufactured by a large and reputable concern, was of a type first approved by Underwriters' Laboratories for installation on gasoline pumps in 1957 and had been on the market in Erie since 1960 or 1961. Jabe Construction and Equipment Company, the contractor retained by Humble for maintenance of pumps at locations selling or using its petroleum products, reputedly had the most competent service staff in the area, and had been similarly retained by other major oil companies. The question then refines itself to this: Considering the physical properties of Flexsteel hose, and given the possibility that a driver might pull away from the pump while the hose nozzle was still in the filler pipe of his car, could Humble reasonably be expected to foresee the probability of such a driving away with the consequent jerk, reduction in bore, increase in pressure and meter head fracture? The answer to this question in this case must be negative. Nor do the instances, real or otherwise, of motorists pulling away from service stations with the nozzle still in the filler pipe, avail the plaintiffs in this matter of foreseeability, for they deal with situations where there is an attendant, i. e., where

the person who does the driving away is not the person whose business it is to mind the nozzle, as was the case at the Yellow Cab garage.

Nor can it be said that the happening of a similar casting fracture, ten days before the accident, is sufficient to put Humble on notice of the potential danger of the installation. There has been no showing that such a danger could have been discerned within that time— in fact, the possibility of a causal relationship between the hose and the facture was one which was discounted by plaintiffs' expert until seeing the demonstration.

On the basis of all the evidence, it is again clear that plaintiffs have failed to meet the burden of proof required to establish the liability of Humble based on negligence in supplying a hose for the pumping unit at the Yellow Cab garage.

STRICT LIABILITY

As an alternate ground of recovery, plaintiffs contend that defendants are liable under the rule of strict liability announced in Section 402A of the Restatement of Torts, Second, which was adopted by the Supreme Court of Pennsylvania in Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966). Briefly stated, Section 402A imposes liability upon a seller for damage caused by a product sold—"in a defective condition unreasonably dangerous"—to the user's property even though the seller—"has exercised all possible care in the preparation and sale of his product." The *Webb* case applied Section 402A to impose liability upon a beer distributor for personal injury damages suffered when a beer keg exploded. Plaintiffs contend that the gasoline pump assembly, although merely a conduit through which the gasoline sold them by Humble passed, is analogous to the keg in the *Webb* case, and/or was a "container" within the meaning of Comment h to Section 402A. Additionally, plaintiffs assert that Humble is liable under Section 402A as the supplier of the pump assembly, including the hose.

■ The last assertion will be disposed of first, so that those preceding it can be considered in more detail. Section 402A is applicable, by its very terms, to *sellers*. Since the Restatement provides rules for lessors of chattels at Sections 407 and 408, and makes no mention of lessors in Section 402A, it is apparent that this section is not intended to be applied to any but sellers. It is stated plainly in Comment f:—

"The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption."

The evidence showed that Humble was not in the business of selling pumps. It showed, to the contrary, that the pump in question was, purchased by plaintiffs from Cemico and sold, still in place, to Humble who then leased it to plaintiffs. To find Humble liable under Section 402 A because it furnished the pump assembly would thus be contrary to both the law and the facts of the case.

To return to the container theory of liability under Section 402A: It clearly appears from the cases cited by plaintiffs under this theory that the containers and the things contained were, in the words of Comment h,—"an integrated whole," which had proceeded from manufacturer to consumer as a "unit." Ordinarily, this Court might be reluctant to extend the container theory to a conduit, but in this instance, such an extension is not necessary, for even if it were made, plaintiffs still would not, on the basis of all the evidence, be entitled to recover under the rule of Section 402A.

Comment h to Section 402A begins:—

"A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling * * the seller is not liable."

The comment continues:—

"Where, however [the seller] has reason to anticipate that danger may result from a particular use, he may be required to give adequate warning of the danger."

That the pump and hose were safe for normal handling is borne out by the evidence that in the many years pumps of this type had been in operation, and in the several years hoses of this type had been in use, no casting fracture had been reported. Similarly, that the damage resulted from abnormal handling is borne out by the evidence that the casting fracture was caused by the jerk on the hose by the cab driving away with the nozzle in the filler pipe. Plaintiffs, however, would make much of the requirement of adequate warning set forth in the quoted portion of Comment h, and assert that the pump assembly was defective, despite their abnormal handling of it, because defendants failed to warn them of the dangers inherent in such handling. The weakness of this assertion is pointed up by the language of Comment j, concerning warnings:—

"But a seller is not required to warn with respect to products * * * when the danger, or potentiality of danger, is generally known and recognized."

Plaintiffs have argued in this regard that although they knew or should have known that hose jerking might produce hose failure, they did not and could not have known that it would produce pump failure, and that therefore their knowledge as to the former did not relieve defendants of the responsibility to warn as to the latter. However, this characterization is faulty, for the plaintiffs, having knowledge of the general danger, cannot be exculpated on the grounds that they were not warned of the specific danger.

■ Moreover, the language—"where * * * [the seller] has reason to anticipate that danger may result from a particular use,"—interjects the concept of foreseeability into defendants' duty to warn. Foreseeability deals with the reasonably probable, not the possible, and does not extend to the negligence of others. It would be unrealistic to hold defendants responsible to foresee the possibility that the same driver who places the nozzle in the filler pipe in such a manner that it will not fall out, will subsequently drive off without first removing the nozzle. Upon a consideration of all the evidence in the case, it must be said that plaintiffs have failed to establish the liability of defendants under Section 402A.

CASE AGAINST A. O. SMITH

Aside from what has been said in plaintiffs' case against both defendants, plaintiffs have brought this action against A. O. Smith individually on several theories:—warranty, negligence, and presumably, strict liability. However, all fail. Smith's defense, that it is not responsible for the negligence or breach of warranty of its corporate predecessor who manufactured the pumping unit, need not be considered in view of the decision reached on the merits.

■ The pumping unit in question was built by Erie Meter Systems, Inc., in 1954. It incorporated a type of meter which had been in successful use since the 1930's. Both the pumping unit and all its components had received Underwriters' Laboratories approval. The components, such as the pump and air eliminator, had been used by other manufacturers as well as Erie for many years without complaints. The pumping unit in question had functioned well at the Yellow Cab garage for almost 10 years prior to the fire. The pump and components were designed to operate at about 50 pounds maximum pressure; the materials used in construction were designed to withstand much greater pressures, and apparently did withstand such pressures. Mr. Crankshaw, plaintiffs' expert testified that it required 250 pounds pressure to cause the gaskets to leak, and about 500 pounds pressure to fracture the meter head casting. It is apparent that Erie was extremely conservative in the design and construction of its pumping unit, and hence cannot be found liable in this regard.

As for liability predicated upon the failure of Erie, or A. O. Smith, to foresee the danger attendant upon the use of the Flexsteel hose, it is sufficient to state that such a duty is unreasonable

and far-fetched. It must be noted that the type of pump had been on the market for several years without complaints, and that it and its components as well as the hose had been approved by the major independent testing laboratory. To require a manufacturer of a product which has been demonstrably safe, to consider and test every conceivable attachment which might be used in conjunction with that product, especially when the attachment had already been tested and certified by an independent agency, is unreasonably burdensome and is not required by law.

■ With respect to strict liability, what was written with respect to Humble is applicable here. Abnormal handling and the unforeseeability thereof completely exonerate A. O. Smith from liability in this regard.

This Court finds no basis for the imposition of liability upon A. O. Smith for the fire which occurred at the Yellow Cab garage.

## NEGLIGENCE OF PLAINTIFFS

■ Defendants have contended that Speyer and Yellow Cab were parts of a unitary enterprise, so that any negligence of an employee of Yellow Cab would be imputable to Speyer. The evidence showed that Henry W. Buhl was the owner of the stock of both corporations. Testimony showed that the predecessor of Yellow Cab, Checker Cab, both conducted the taxicab business and owned the building from which it was conducted, the building destroyed in the fire. In 1948, Speyer was organized and bought the building from Checker Cab and leased it back to Checker, which some time thereafter changed its name to Yellow Cab. Speyer's sole asset was the building. This sale of the building was carried out, Mr. Buhl testified, for business reasons, because the taxicab company, as a public utility, could not sell real estate without the permission of the Pennsylvania Public Utility Commission. Since 1948, Mr. Buhl, when in Erie, actively participated in the management of Yellow Cab, a fact which was not disclosed until late in the trial. In his testimony during plaintiffs' portion of the case, Mr. Buhl professed to know very little of the operations of Yellow Cab; later, when it became apparent that the tide was not running in their favor, Mr. Buhl demonstrated a remarkable acquaintance with the details of the business. There was little other business for Speyer than acting as "landlord" to Yellow Cab. Speyer had no office of its own, maintained no ledgers or books of original entry, and was served by the same accountants as Yellow Cab. Mr. Harper, the president of Yellow Cab, performed many duties for Speyer, and at times when Mr. Buhl was out of town, was the only person who could act for Speyer. In addition, rental adjustments and intercompany loans indicate that the two plaintiffs were anything but the discrete organizations claimed by plaintiffs. On the basis of this evidence, this Court has no difficulty in finding that the two plaintiffs—Speyer, Inc. and Yellow Cab —were parts of a unitary business enterprise owned and controlled by Henry W. Buhl for purposes of engaging in the taxicab business in Erie. Mr. Buhl was in command of the business operated by Speyer as well as the taxicab business. It is true that Mr. Harper was president, but Mr. Buhl was the boss. He knew all about the installation of the advertising signs on the back of the cabs. He knew all about the various nozzles and where they were purchased. He was aware at all times of the practice in refueling the cabs. He was aware of the trouble Yellow Cab had with various types of gasoline hoses. It is true he was away from the city at times, but nevertheless was the active head of the business of both plaintiffs.

The negligence, if any, of an employee of Yellow Cab is therefore imputable to Speyer.

■ The evidence clearly establishes that the meter casting fracture was caused by the jerk given the hose when one of Yellow Cab's employees drove away from the pump without removing the nozzle from the filler pipe of his cab. The evidence also establishes that a jerk

of at least 175 pounds is required to fracture a casting. The only type of automatic nozzles approved for use by Underwriters' Laboratories feature break-away spouts which shear off at a 150 pounds or less pull. The inference then is justified that the nozzle in question either did not have a break-away spout, or if it did have one, was in such a position or was so attached to the cab that the break-away feature was in effect subverted. The furnishing and maintenance of nozzles was the responsibility of Yellow Cab. There is evidence that Yellow Cab had purchased non-break-away spouts and latch kits [which would be used to convert the old-style, non-automatic nozzles to automatic nozzles]; if used together, the resulting nozzle would not be approved by either Underwriters' Laboratories or by the Commonwealth of Pennsylvania. There was evidence that the spouts were permitted to become loose and could be rotated ninety degrees from the position in which the break-away feature was effective. There was evidence that the drivers would "lock" the nozzle into the filler pipe by placing the advertising sign on top of the nozzle. The nozzle which was on the pump preceding the fire apparently was not found in the debris, for it was not introduced into evidence; its condition when the cab driver pulled away with it in the fuller pipe thus remains, on the basis of the evidence, little more than conjecture, as does the matter of whether or not it was somehow "locked" into the filler pipe. Even so, on the basis of the evidence, it is clear that the nozzle did remain in the filler pipe and that the hose was rapidly pulled out to its full length when the cab was driven away.

On this basis then is the negligence of plaintiffs irrefutably established: the failure of the driver whose duty it was to remove the nozzle from the filler pipe before driving away from the pump, so to do. Nor is it a defense to argue as plaintiffs do, that he could not have been aware of the exact nature of the danger involved; it is sufficient that he be, or should be, reasonably aware that the natural consequences of his act be dangerous. This Court has no difficulty in finding that plaintiffs, through the actions of their driver in pulling away from the pump without removing the nozzle from filler pipe of his cab, were negligent, and that such negligence was the proximate cause of the fire.

INDEMNITY

The Equipment Lease between plaintiffs and Humble contains an indemnity provision under the terms of which Yellow Cab agreed to indemnify and save harmless Humble—

"of and from any and all liability or claims for loss, damage * * * to * * * property * * * caused or occasioned by any leakage, fire or explosion of any of the products stored in said equipment or contained in or drawn through said equipment or by or in the * * * maintenance, repair * * * of said equipment or any of the attachments * * * whether due to latent or patent imperfections * * or whether due to the negligence of Lessor or otherwise."

It is undenied that exculpatory agreements or contracts of indemnity are valid in Pennsylvania, provided they are properly executed, clearly express the intent of the parties, are between commercial entities, and do not otherwise contravene public policy or law. The lease was signed by the president of Yellow Cab, T. J. Harper, who was intimately concerned with the everyday operations of plaintiffs. The lack of evidence of an authorizing directors' resolution or of a corporate seal is not sufficient, in these circumstances, to invalidate the lease on the grounds it was improperly executed.

So too is it clear that the intent of the agreement was for Yellow Cab to indemnify and save harmless Humble from liability such as that which might be imposed upon it in this lawsuit. There is no question but that Yellow Cab and Humble are commercial entities—

both are corporations and both have been engaged in their respective businesses for several years. There has been no showing that any public policy has been contravened by this agreement or that it is contrary to law.

■ Therefore, the indemnity agreement between Yellow Cab and Humble is valid and enforceable, and would, had not Humble been found free from negligent liability with respect to the fire, operated to exonerate it regardless of any finding of negligence.

\* \* \*

Counsel at oral argument and in their briefs have referred to a host of decisions on the law of negligence, especially relating to the concept of foreseeability and want of care. These citations have been examined. However, it is not believed that decisional citations are necessary in this opinion. The sum total of the evidence in this case not only exonerates Humble and Smith from any legal fault, but on the contrary clearly establishes that the cause of the fire was the careless refueling practices permitted by plaintiffs.

JURISDICTIONAL FINDINGS AND CONCLUSIONS

1. Both plaintiff corporations Speyer and Yellow Cab are organized and exist under the laws of Pennsylvania, and have their principal place of business in Erie, Pennsylvania.

2. Defendant Humble is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of New York.

3. A. O. Smith is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of Wisconsin.

4. As permitted by Rule 52, this Opinion includes the findings of fact and conclusions of law.

■ 5. Although the case was tried on liability only against Humble and Smith, the evidence establishes that the fire caused damages to each of the plaintiff corporations in excess of $10,000. This Court concludes it has jurisdiction of the parties under the diversity statute and of the subject matter of this civil action.

## GLOSSARY

1. SPEYER ................ Speyer, Inc.—Plaintiff
2. YELLOW CAB ........... Yellow Cab Company of Erie—Plaintiff
3. HUMBLE ............... Humble Oil and Refining Company—Defendant
4. A. O. SMITH ............. A. O. Smith Corporation—Defendant
5. ROCKWELL ............. Rockwell Manufacturing Company—Third Party Defendant
6. JABE ................... Jabe Construction and Equipment Company—Third Party Defendant
7. CEMICO ............... Cemico Oil Company
8. ERIE METER SYSTEMS .. Erie Meter Systems, Inc. predecessor to A. O. Smith
9. #910 PUMP ............. Erie Model #910 Pump
10. ESSO .................. Esso Standard Oil Corporation, predecessor to Humble.
11. GOODYEAR ............. Goodyear Tire and Rubber Company