427 A.2d 657

**Monica SHERK, Administratrix of the Estate of James Louis Sherk, Deceased, Appellant,**

**v.**

**DAISY–HEDDON, a Division of Victor Comptometer Corporation**

**v.**

**Michael SAENZ, June Saenz and Robert Saenz.**

Superior Court of Pennsylvania.

Argued Nov. 13, 1979.

Filed March 13, 1981.

Petition for Allowance of Appeal Granted June 22, 1981.

Peter J. Mansmann, Pittsburgh, for appellant.

John W. Jordan, IV, Pittsburgh, for Daisy-Heddon, appellee.

Michael A. Donadee, Pittsburgh, for Michael and June Saenz, appellees.

Shelley A. Bould, Pittsburgh, for Robert Saenz, appellee.

Before CERCONE, President Judge, and MONTGOMERY and LIPEZ, JJ.

CERCONE, President Judge:

Appellant, Monica Sherk, administratrix of the estate of James Louis Sherk, takes this appeal from the order of the court below, sitting *en banc*, which denied plaintiff-appellant's motion for a new trial in a products liability case. Appellant presents three questions for our review: (1) whether it was error for the trial court to exclude evidence of the common knowledge in the community concerning the dangers of the product at issue—a Daisy-Heddon air rifle Model 880, manufactured by the Daisy-Heddon Corporation; (2) whether it was error for the trial court to refuse appellant's request that the case be submitted to the jury on a

negligence theory, in addition to strict liability; (3) whether it was error for the trial court to grant appellee-Daisy-Heddon's[1] motion for a directed verdict on appellant's cause of action which was based on Section 402(B) of the Restatement of Torts. After careful review, we conclude that appellant's first two arguments have merit, but the third does not. We, therefore, reverse and remand for a new trial on the strict liability and negligence counts, but affirm the directed verdict on the Section 402(B) misrepresentation theory.

Plaintiff-appellant, Monica Sherk, filed this action in trespass to recover for the death of her fourteen-year-old son, James, who died on April 7, 1973, as a result of a BB shot to the head accidently inflicted by Robert Saenz, James' friend. The circumstances surrounding James' death are as follows.

In the early part of 1973, fourteen-year-old Robert Saenz, a good friend of James Sherk, received permission from his parents to purchase an air rifle. Robert selected the air rifle from the catalogue of the Alden Company, and ordered a Model 880 "Power King" air rifle manufactured by the Daisy-Heddon Company. In the Alden's catalogue, the "Power King" was pictured along with four other models of Daisy air guns, including the Western carbine, the Daisy Pac-a-long Pump, the Marksmann M–4000 and the Daisy Peacemaker.[2] The Daisy trademark was prominently pictured in the catalogue and, with the exception of the Marksmann M–4000, was included in the description of each of the air guns. Nothing in the advertisement indicated that the Power King was more dangerous than the other four models, nor was there any indication that the Power King

1. Appellees Michael and June Saenz have also submitted a brief in which they argue for several reasons that the ruling of the trial court in granting a directed verdict in their favor should be affirmed. We need not address any of the issues raised by the Saenzs since neither appellant nor appellee-Daisy-Heddon challenges this directed verdict.

2. The latter four air guns are part of Daisy-Heddon's "Youth-Line," although this fact was not specifically mentioned in this ad.

was designed for older adolescents and adults, unlike the other air guns pictured.[3]

The air rifle arrived in a box marked with the logo of the Daisy-Heddon Corporation and the words "Pump-Up Air Gun." No recommended age range was printed on the box. Inside the carton were two booklets—one entitled the "Daisy BB Rifle Instruction Manual," the other "How to Operate the Daisy Pump-Up Air Gun." The instruction manual made no specific reference to the "Power King" model but, instead, gave general instructions on the use of Daisy BB rifles. The first page of the manual contained the "Code of the Daisy Rifleman," which was essentially the "ten commandments" for using a BB gun. Rule number six read "Never point a gun at anything you do not want to shoot. NEVER POINT A GUN AT ANYONE." In the text of the instructions, the booklet said in part,

"The spring type BB rifle program develops safety habits in youngsters who have a natural curiosity for guns.

.    .    .    .    .

The Daisy Group Shooting Program, like other youth activities, must have leadership and direction. Adult supervision is necessary for organizing the activity, securing the range space and giving instructions. The adult leader need not be familiar with the sport of target shooting. Instead, he or she must be the kind of person interested in working with boys and girls.

.    .    .    .    .

*The Daisy BB Rifle is a low-power BB gun. The power is limited at the factory by the size spring used in the gun. It is not a high-power pneumatic, gas, pellet or compressed air gun.*" (Emphasis added.)

The other booklet ("How to Operate . . .") offered more specific instructions on the use of the Power King. In the body of the instructions, this booklet said,

**3.** The Alden's ad said, "Daisy 880 'Power King BB repeater and .177 pellet single-shot.' The more you pump, the more powerful the shot! 10 strokes for maximum velocity. Magazine holds 100 BB's. Molded Monte Carlo stock and forearm. 'No-pinch' pump lever handle. Bolt safety."

"As the proud owner of a Daisy Pump-Up Air Gun, you have become a part of an American tradition which dates back to the time your great-grandfather was a small boy. Your new Daisy is the result of more than 80 years experience by Daisy in the manufacturing of quality products.

*The Pump-Up Air Gun is a new, much more powerful type gun than the traditional Daisy spring-air BB gun and must be treated with great care and respect.*

ALWAYS HANDLE A GUN AS IF IT WERE LOADED. 'Handling' means every time you touch your gun. It also means you must never point your gun towards any living thing nor at any part of your own body nor at anything that could be damaged by an accidental shot. Habits which you form in handling your new Daisy will be helpful in the handling of any gun.

The Instruction Manual which was packed with your Daisy tells about the care and safe handling of any gun. Be sure to study the 'Ten Commandments of Gun Safety' printed in the Instruction Manual. It is your responsibility as the owner of this gun to make certain that anyone using it is instructed in proper operation of this gun." (Emphasis added.)

On April 7, 1973, four days after receiving the gun, Robert Saenz, without his parents' knowledge or permission, took the Power King air rifle into the woods behind his home where he and James Sherk took turns shooting at bottles and cans. Prior to this date, Robert had shot air rifles belonging to other people a few times, and had even been hit by BBs on several occasions, but experienced no injury more serious than a black and blue mark where the BB had struck him. (Robert's father also had similar experiences with air guns, and knew that a BB could put out someone's eye.) When the two youths were playing with the air rifle, Robert unintentionally shot James in the head. The BB shot penetrated five inches into James' brain, and James died the next day as a result of his injury.

Appellant introduced evidence at trial of an inter-office memo written by a product evaluator at the Daisy Company showing that the Daisy-Heddon Company was aware of danger of serious injury before the Power King was put on the market. In part, the memo said:

"This is a dangerous gun, it is not a controlled velocity play gun for which we are noted . . .

To get a feeling for just how dangerous this unit is, I have conducted some penetration tests using the 880 as compared with some of our other models.

Attached is a photo of shots fired at a material simulating animal tissue with units that represent different levels of velocity and energy in our product line.

*It is easy to note that the penetration possibilities of the 880 of a ¾ inch depth opens up new areas of vulnerability when this unit is unsafely used. Whereas we now can injure an eye or irritate the skin, we will be able to inflict a dangerous wound with the high velocity 880.*" (Emphasis added.)

■ At trial, appellant attempted to prove that Daisy-Heddon was generally known as a manufacturer of air guns that could be used by youths between the ages of eight to fourteen. It was appellant's premise that appellee's "Daisy" logo was viewed as identifying a type of air gun which, although it could blind, it could not kill a person. Therefore, appellant contends that since the "Daisy" logo was so viewed, and because the Power King was an air rifle which differed markedly from the usual line of Daisy air guns in that it could be lethal, the manufacturers should have put a warning on the Power King telling the consumer of the Power King's deadly potential. Although the trial court allowed appellant to introduce evidence which showed how the Saenz themselves viewed the "Daisy" logo, according to their experiences with the gun, the court refused to allow appellant to introduce evidence of the community's view of the "Daisy" logo, ruling this latter fact to be irrelevant. We find this to be error.

The Restatement of Torts (2nd) § 402(A)(1965) was adopted by the Supreme Court in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). Section 402(A) provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or to his property, if

(a) The seller is engaged in the business of selling such a product, and

(b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) The seller has exercised all possible care in the preparation and sale of his product, and

(b) The user or consumer has not bought the product from or entered into any contractual relation with the seller."

Comment (i) to Section 402(A) elaborates on the concept of "unreasonable danger" for Section 402(A) purposes. In relevant part, comment (i) says,

"The rule stated in this section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer . . . . The article sold must be *dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.*" (Emphasis added.)

In keeping with comment (i), one treatise summarizes the rule for the manufacturer's duty to warn under Section 402(A) thusly:

"The rule stated in § 402(A) of the Restatement is held to apply only when the product is in a condition not contemplated by the ultimate consumer, *and dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteris-*

*tics.* Thus, a product containing an obvious hazard is considered neither defective nor unreasonably dangerous, and therefore there is no duty to warn of such dangers, even under strict liability principles." (Emphasis added.)

Comment (j) to § 402(A) points out that some products may be defective and unreasonably dangerous within the meaning of this section if the seller does not include a warning concerning the danger with the product.[4] Although comment (j) focuses on warnings relative to the dangers of ingredients in food and drugs, without question this duty extends to other types of products, including equipment and household goods.[5]

On the basis of comments (i) and (j), one treatise summarizes the rule for the duty to warn thusly:

"The test to determine whether a danger is obvious is an objective one, not dependent upon the actual knowledge of the user, or his actual awareness of the danger. *It is the knowledge and realization of the danger that would be possessed by the ordinary consumer who purchases or uses the product* .... If the product is one customarily used by children, the danger must be one which children would be likely to recognize and appreciate in order to prevent them from recovering for a product related injury on the grounds that the danger was open and obvious."[6]

Without further elaboration, it is evident that under § 402(A) the necessity of a warning by the manufacturer depends in part upon the knowledge of the "ordinary con-

---

4. In relevant part, comment (j) reads:

   "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.

   Where warning is given, the seller may reasonably assume that it will be read and heeded, and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

5. Prod.Liab.Rep. (CCH) § 4095 (1979).

6. W. Kimble & R. Lesher, Products Liability § 196 (1979) (footnote omitted) (emphasis added).

sumer who purchases it, with the ordinary knowledge common to the community" as to the characteristics of the product.[7]

Appellee in its brief contends that the perceptions of the community regarding the product at issue have been ruled irrelevant under § 402A by the Supreme Court's decision in *Azzarello v. Black Brothers, Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978). Appellee's interpretation of *Azzarello* is incorrect. In *Azzarello*, the Supreme Court noted that there are two requirements set forth in Section 402A for liability—that the product be "in a defective condition," and that it be "unreasonably dangerous." However, the *Azzarello* court recognized that there are difficulties inherent in giving a jury instruction using the term "unreasonably dangerous." The *Azzarello* court cited the California Supreme Court in *Cronin v. J. B. E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 442, 501 P.2d 1153, 1162 (1972), in which the *Cronin* court disapproved the "unreasonably dangerous" terminology because it "rings of negligence." The *Cronin* court further said:

> "We recognize that the words 'unreasonably dangerous' may also serve the beneficial purpose of preventing the seller from being treated as the insurer of its products. However, we think that such protective end is attained by the necessity of proving that there was a defect in the manufacture or design of the product and that such defect was a proximate cause of the injuries. Although the seller should not be responsible for all injuries involving the use of its products, it should be liable for all injuries proximately caused by any of its products which are adjudged 'defective.' " *Id.* at 133, 104 Cal.Rptr. at 442, 501 P.2d at 1162. (footnote omitted).

Therefore, the *Cronin* court, while acknowledging that § 402A employs the term "unreasonably dangerous" to indicate that the seller should not be treated as the insurer of its

7. For a discussion of the consumer expectation test see, A. Weinstein, A. Twerski, H. Piehler & W. Donaher, Products Liability and the Reasonably Safe Product, 52–53 (1978).

product, nonetheless rejected the use of this term in a products liability case because the term "rings of negligence." The *Azzarello* court similarly ruled that the term "unreasonably dangerous" should not be used when instructing the jury in a products liability case because it is inadequate to guide a lay jury. Appellee would now have us extend the holding of *Azzarello* to new limits, arguing that since comment (i) to section 402A is captioned "Unreasonably Dangerous," and that since the consumer expectation test is discussed in comment (i), then the *Azzarello* decision implicitly rejected the consumer expectation test. Appellee is in error. The California courts have addressed this identical issue in cases subsequent to the *Cronin* decision and those decisions have delineated the importance and necessity of the consumer expectation test as one method of defining the meaning of "defective" in a products liability context.

In *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 234, 573 P.2d 443, 452 (1978), the California court emphasized that its decision in *Cronin* "did not preclude a trial court from framing a definition of defect, appropriate to the circumstances of a particular case, to guide the jury as to the standard to be applied in determining whether a product is defective or not." The *Barker* court went on to say, "[T]he term defect as utilized in the strict liability context is neither self-defining nor susceptible to a single definition applicable in all contexts." *Id.* at 427, 143 Cal.Rptr. at 235, 573 P.2d at 453. The *Barker* court undertook to further clarify its ruling in the *Cronin* case thusly:

"Although in *Cronin* we rejected the Restatement's 'unreasonably dangerous' gloss on the defectiveness concept as potentially confusing and unduly restrictive, we shall explain that our *Cronin* decision did not dictate that the term 'defect' be left undefined in jury instructions given in all product liability cases.

[W]e have concluded . . . that a product is defective in design either *(1) if the product has failed to perform as safely as an ordinary consumer would expect when used in*

*an intended or reasonably foreseeable manner,* or (2) if, in light of the relevant factors, the benefits of the challenged design do not outweigh the risk of danger inherent in such design." *Id.,* 143 Cal.Rptr. at 228, 573 P.2d at 446. (emphasis added).

The relevant factors considered important by the court included the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

Subsequently, in *Cavers v. Cushman Motor Sales, Inc.,* 95 Cal.App.3d 338, 157 Cal.Rptr. 142 (1979), the California Court of Appeal discussed the *Cronin* and *Barker* decisions specifically in the context of the failure to warn. The *Cavers* court quoted, as did the *Barker* court, from an article by Professor Wade, in which he said,

"[The] natural application [of the term 'defective'] would be limited to the situation in which something went wrong in the manufacturing process, so that the article was defective in the sense that the manufacturer had not intended it to be in that condition. To apply [the term 'defective'] also to the case in which a warning is not attached to the chattel or the design turns out to be a bad one or the product is likely to be injurious in its normal condition ... [and] [t]o use it without defining it to the jury is almost to ensure that they will be misled."[8]

The *Cavers* court then concluded,

"In assisting the jury's determination of whether the absence of a warning makes a product defective, the trial court should focus their attention on such relevant considerations as the normal expectations of the consumer as to how the product will perform, degrees of simplicity or

8. Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.V. 825, 831–32 (1977) (footnotes omitted). Cited by *Barker v. Lull Engineering Co., Inc., supra,* 20 Cal.3d at 428, 143 Cal.Rptr. at 235, 573 A.2d at 453, *Cavers v. Cushman Motor Sales, Inc., supra,* 95 Cal.App. at 346, 157 Cal.Rptr. at 147.

complication in the operation or use of the product, the nature and magnitude of the danger to which the user is exposed, the likelihood of injuring, and the feasibility and beneficial effect of including a warning." *Cavers v. Cushman Motor Sales, Inc., supra,* 95 Cal.App.3d at 347, 157 Cal.Rptr. at 148.

Applying the reasoning from the *Barker* and *Cavers* cases to the issue at hand shows appellee's argument to be without merit. *Barker* and *Cavers* both are cases which follow the holding of *Cronin,* that is to say, that the "unreasonably dangerous" terminology should not be utilized in jury instructions on defects in products liability cases.[9] The *Azzarello* court cited *Cronin* with approval. The opinion in *Barker* and *Cavers,* in expanding on the *Cronin* holding, show that the consumer expectation test not only be given to jurors without reference to the "unreasonably dangerous" terminology but that this test in appropriate cases may be necessary to define for the jurors the meaning of the term "defect." Therefore, we find appellee's position to be without merit.

■ Appellant next argues that the trial court erred when it refused to allow the instant case to go to the jury under the theory of negligence. The court reasoned, since negligence is not an issue in a strict liability case, plaintiff-appellant should not be permitted to submit his case to the jury on a theory of negligence in addition to her theory of strict liability. We find that the court was in error on this point.

In reaching its decision, the trial court relied upon language contained in *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 96–97, 337 A.2d 893, 900 (1975) (plurality), where the Supreme Court wrote:

**9.** In *Varner v. Pretty Products, Inc.,* 270 Pa.Super. 86, 410 A.2d 1261 (1979), this court interpreted *Azzarello* and *Berkebile* to mean that although the "unreasonably dangerous" terminology should not be used to charge the jury in a section 402A case, such terminology may be used as an alternate basis for liability. The issue in the instant case does not turn an issue of the "unreasonably dangerous" terminology but rather on the use of the consumer expectation test. Nevertheless, we note our decision in *Varner* for completeness.

"We hold today that the 'reasonable man' standard in any form has no place in a strict liability case. The salutary purpose of the 'unreasonably dangerous' qualification is to preclude the seller's liability where it cannot be said that the product is defective; this purpose can be met by requiring proof of a defect. To charge the jury or permit argument concerning the reasonableness of a consumer's or seller's actions and knowledge, even if merely to define 'defective condition' undermines the policy considerations that have led us to hold in [*Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 319 A.2d 903 (1974)] that the manufacturer is effectively the guarantor of his product's safety. The plaintiff must still prove that there was a defect in the product and that the defect caused his injury; but if he sustains this burden, he will have proved that as to him the product was unreasonably dangerous. It is therefore, unnecessary and improper to charge the jury on 'reasonableness.' [*Cronin v. J. B. E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972); *Glass v. Ford Motor Co.*, 123 N.J.Super. 599, 304 A.2d 562 (1973)]."

We find the court's reliance upon *Berkebile* to be misplaced. In *Berkebile* the plaintiff filed suit against the defendant-manufacturer only under the theory of strict liability. There was no cause of action based on negligence before the *Berkebile* court. Rather, the issue before the *Berkebile* court was whether, in a strict liability cause of action, the plaintiff had to prove that the asserted defect was "unreasonably dangerous" in addition to proving that the product was defective and that the defect caused his injury. The *Berkebile* court ruled that a plaintiff need not prove the "unreasonable danger" of the defect as a separate element because the plaintiff will have already proved "unreasonable danger" within the meaning of Section 402(A) by proving the defect and that the defect was the proximate cause of his injury. The Supreme Court made no reference to a situation such as that before this Court in which the plaintiff files causes of action for both negligence and strict liability.

However, the Pennsylvania Rules of Civil Procedure would appear to cover this question. In Pa.R.C.P. 1044(a), it states:

"The plaintiff may state in his complaint two or more causes of action in trespass, triable in the same county, which arise from the same transaction or occurrence or series of transactions or occurrences."

Plaintiff's complaint is in keeping with this Rule. Furthermore, there are several cases in which the manufacturer of a product was sued in both § 402(A) strict liability and in part for negligence for failing to warn of dangers of the product, both in this and in other jurisdictions. See, e. g., *Pegg v. General Motors Corp.*, 258 Pa.Super. 59, 391 A.2d 1974 (1979); *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843 (1978); *Mohr v. B. F. Goodrich Rubber Co.*, 147 N.J.Super. 279, 371 A.2d 288 (1977). Therefore, we find that the lower court erred in dismissing appellant's cause of action in negligence.

■ Lastly, appellant contends that the lower court erred in granting Daisy-Heddon's motion for a directed verdict on appellant's cause of action under Section 402(B) of the Restatement of Torts for misrepresentation by seller of chattels to consumer.[10] Section 402(B) reads:

"One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though

(a) it is not made fraudulently or negligently, and

(b) the consumer has not bought the chattel from or entered into any contractual relation with the seller."

Appellant argues that the logo of the Daisy-Heddon corporation on the box of the Power King constituted a representa-

---

**10.** Section 402(B) was adopted by the court in *Klages v. General Ordnance Equipment Corp.*, 240 Pa.Super. 356, 367 A.2d 304, 310 (1976).

tion that the product possessed the same essential characteristics as other products made by that manufacturer and that this representation was false. The lower court rejected appellant's position, finding that there was no misrepresentation within the meaning of § 402(B) in the instant case. On this point, we agree with the trial court.

The Comments to Section 402(B) are instructive on this point. Comment (b) reads:

> "The rule stated in this Section differs from the rule of strict liability stated in § 402(A), which is a special rule applicable only to sellers of products for consumption and does not depend upon misrepresentation. The rule here stated applies to one engaged in the business of selling any type of chattel, and is limited to misrepresentations of their character or quality."

Comment (f) elaborates on the meaning of misrepresentation of character or quality, saying, in relevant part:

> "The rule stated applies to any misrepresentation of a material fact concerning the character or quality of the chattel sold which is made to the public by one so engaged in the business of selling such chattels. The fact misrepresented must be a material one, upon which the consumer may be expected to rely in making his purchase, and he must justifiably rely upon it."

Comment (h) defines "to the public" thusly:

> "The rule stated in this Section is limited to misrepresentations which are made by the seller to the public at large, in order to induce purchase of the chattels sold, or are intended by the seller to, and do, reach the public. The form of the representation is not important. It may be made by public advertising in newspapers or television, by literature distributed to the public through dealers, by labels on the product sold, or leaflets accompanying it, or in any other manner, whether it be oral or written."

In *Klages v. General Ordnance Equipment Corp.*, 240 Pa.Super. 356, 367 A.2d 304, 310 (1976), we were called upon to interpret § 402(B), and we concluded that this section was concerned with "the manufacturer's *express* statement

about his product and whether the product in fact conforms to that representation." (Emphasis added.) In the instant case, there was no *express* misstatement of a material fact by the manufacturer. The case at bar more properly belongs under Section 402(A) than Section 402(B), for as one treatise noted, "No court has yet construed § 402(B) to apply to 'representations' inferred from non-disclosure of facts." [11] The case at bar is an instance where it was the non-disclosure of facts, i. e., the absence of a warning, which was said to have caused the injury. This is not the type of situation which comes within the ambit of § 402(B). Therefore, we find no error in the lower court's ruling on this point.

Accordingly, for the reasons set forth above, we reverse the lower court on the evidence issue and for refusing to submit appellant's case to the jury under a negligence theory, but affirm the lower court's dismissal of appellant's Section 402(B) cause of action.

Order of the court below is reversed and the case is remanded for further proceedings consistent with this opinion.

MONTGOMERY, J., files a concurring opinion.

LIPEZ, J., files a dissenting opinion.

MONTGOMERY, Judge, concurring:

I agree with the result reached by President Judge Cercone in his excellent majority opinion. However I also wish to note my belief that extra caution must be exercised in cases such as the instant one where a jury is asked to evaluate claims of both negligence and strict liability. I expressed similar concerns in my Dissenting Opinion in *Varner v. Pretty Products, Inc.*, 270 Pa.Super. 86, 410 A.2d 1261 (1979).

It is clear that a plaintiff may pursue a recovery on the separate theories of negligence and strict liability in a single action. See *Varner v. Pretty Products, Inc.*, Id.; *Pegg v. General Motors Corp.*, 258 Pa.Super. 59, 391 A.2d 1074 (1978); *Clouser v. Shamokin Packing Co.*, 240 Pa.Super. 268,

11. W. Kimble & R. Lesher, Products Liability § 112 n.10 (1979).

361 A.2d 836 (1976). However, as these cases and several others indicate, even our appellate courts have had difficulty in delineating the correct approach to be taken in submitting the strict liability issues to the jury. Compare *Azzarello v. Black Brothers Company, Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978); *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975); and *Varner v. Pretty Products, Inc.*, supra. While the strict liability issues may themselves present difficult concepts for the jurors to analyze and apply in any given case, the complexity and possibility of confusion can only be multiplied if the jurors are also required to consider the application of ordinary negligence rules in the same action.

I believe that the only sensible approach for the trial judge in such circumstances is to submit the case to the jurors for special findings with respect to the separate theories advanced. Under such a procedure, not only will the jurors find it less confusing to evaluate and resolve the distinct issues presented, but also, it will promote a more efficient appellate review in any subsequent appeal. The absence of such special findings may in fact lead to uncertain speculation on appeal as to the basis for the jury's conclusion when the issues of strict liability and negligence are jointly submitted for a single general verdict.

LIPEZ, Judge, dissenting:

I agree with the opinion of President Judge Cercone that Daisy-Heddon's motion for directed verdict on appellant's 402B cause of action was properly granted. Since I disagree with the panel's resolution of the other two issues, however, I should affirm the entry of judgment in Daisy-Heddon's favor.

1.

Appellant's claim that the trial court erred in refusing to admit evidence tending, purportedly, to show the ordinary knowledge, common to the community, of the characteristics of Daisy-Heddon guns in general was not raised in post-trial motions filed with the court below, and therefore is waived. Pa.R.Civ.P. 227.1; *Canada Dry Bottling Co. v. Mertz*, 264

Pa.Super. 480, 484, 400 A.2d 186, 188 (1979); *Leopold v. Davies*, 246 Pa.Super. 176, 178, 369 A.2d 868, 869–70 (1979); see *Dilliplaine v. Lehigh Valley Transit Co.*, 457 Pa. 255, 322 A.2d 114 (1974); *see also Commonwealth v. Bronaugh*, 459 Pa. 634, 331 A.2d 171 (1975).

## 2.

It is clear that a court must charge a jury, when so requested, on negligence as well as strict liability when the trial has brought forth evidence on which a jury reasonably could find a party negligent. *Pegg v. General Motors*, 258 Pa.Super. 59, 79, 391 A.2d 1074, 1083 (1978). Upon examining the record, I conclude that the jury could not, on the evidence adduced, find that Daisy-Heddon had been negligent. "A duty to warn exists only when those to whom the warning would go can reasonably be assumed to be ignorant of the facts which a warning would communicate. If it is unreasonable to assume [that] they are ignorant of the facts, there is no duty to warn." *Burton v. L. O. Smith Foundry Products Co.*, 529 F.2d 108 (7th Cir. 1976).

In the case before us, Robert Saenz testified that a friend had told him that the Model 880 was "a lot more powerful" than an ordinary BB gun; that a projectile fired from the Model 880 would pierce both sides of a steel can and shatter glass bottles, and that a BB gun, ordinarily, was capable of neither feat; that his father had told him not to use the gun until the father could instruct him in its proper use; that he expected to be able to kill rodents with the Model 880; and that a number of people, including both his parents, had told him never to point any gun at anyone. The evidence thus shows, clearly, that Robert was well aware of the gun's power and ability to cause serious harm, and of the necessity of great care in its use. A warning by Daisy-Heddon specifically that a projectile from the gun could penetrate a certain distance into a human body, and thereby, perhaps, cause death would therefore have been unnecessary. Because he had knowledge of the general dangers, it cannot be said that he should have been specially warned of such a narrowly defined possibility. *Speyer, Inc. v. Humble Oil and Refining Co.*, 275 F.Supp. 861 (W.D.Pa.1967), *aff'd*, 403 F.2d

766 (3rd Cir. 1968). There is no duty to warn that "a knife or an ax will cut, a match will take fire, dynamite will explode, or a hammer may mash a finger." W. Prosser, *Handbook of the Law of Torts* 649 (4th ed. 1971).

In addition, because a seller has substantially the same duty to warn under a theory of negligence as under strict liability, *see Burton v. L. O. Smith Foundry Products Co., supra* at 111 *citing* Prosser, *supra* at 659 n. 73, comment j to section 402 A may be applied to the instant matter. That provision states, in relevant part:

> But a seller is not required to warn with respect to products ... which are only dangerous or potentially so ... when the danger ... is generally known and recognized...
>
> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.[1]

The literature packed with the Model 880 included these statements:

> The Pump-Up Air Gun is a new, much more powerful type gun than the traditional Daisy spring-air B • B gun. It shoots with four to six times the power of the spring-air B • B gun and must be treated with great care and respect.
>
> ALWAYS HANDLE A GUN AS IF IT WERE LOADED. "Handling" means every time you touch your gun. It also means that you must never point your gun toward any living thing nor [sic] at anything that could be damaged by an accidental shot.

(Emphasis in original.) The "Code of the Daisy Rifleman," in another pamphlet included with the gun, also emphasized these cautions:

---

1. This comment was quoted with approval in *Speyer v. Humble Oil and Refining Co.*, 275 F.Supp. 861, 869 (W.D.Pa.1967), aff'd 403 F.2d 766 (3rd Cir. 1968). Had the issue not been waived, I should have considered the applicability of comment j to appellant's first argument.

Be sure of your target before you pull the trigger. Never point a gun at anything you do not want to shoot. NEVER POINT A GUN AT ANYONE. (Emphasis in original.) Obviously, had Robert acted according to the above instructions, he would never have pointed his gun at or near James Sherk, and Sherk would never have been injured by it. Comment j indicates that, having provided warnings which, if followed, would have prevented the death of Sherk, Daisy-Heddon had a right to assume that they would be read and heeded; the testimony of Robert and his parents that they had never read them places no additional responsibility upon Daisy-Heddon.

I conclude, for the above reasons, that, although the trial court's legal basis therefor was incorrect, his refusal to charge the jury on negligence should be sustained. Because appellant waived her "community knowledge" argument, and was properly put out of court on her 402 B claim, I should affirm the order and judgment of the court below.