Charles COLEGROVE, Plaintiff,

v.

CAMERON MACHINE CO.; Midland Ross Corp., Cameron–Waldron Division; Cameron Converting, Inc.; Allen–Bradley Company, Inc.; Allen–Bradley Company, LLC; Allied Signal, Inc.; Somerset Industries; and Kathabar, Inc., Defendants.

No. 99–CV–258 J.

United States District Court,
W.D. Pennsylvania.

Oct. 23, 2001.

---

Edward F. Silva, Marc J. Syken, Jeffrey Nydick, Feinberg & Silva, Philadelphia, PA, for Charles Colegrove.

Michael D. Heintzman, Heintzman, Warren, Wise & Fornella, Pittsburgh, PA, John P. Shea, Kent & McBride, Philadelphia, PA, for Cameron.

Kenneth L. Salmon, David E. White, Thorp, Reed & Armstrong, Pittsburgh, PA, Bruce D. Lombardo, Sean G. Duffy, Powell, Trachtman, Logan, Larrle, Bowman & Lombardo, King of Prussia, PA, for Allen–Bradley.

## OPINION AND ORDER

D. BROOKS SMITH, Chief Judge.

Before me is defendant Allen–Bradley's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial. Dkt. no. 92. Plaintiff Charles Colegrove brought a strict liability action against Allen–Bradley Company, Inc. and Allen–Bradley Company, LLC (collectively "A–B") for injuries he sustained while working on a paper winding machine at the Westvaco Paper Company, and the jury found in his favor. A–B is entitled to neither judgment as a matter of law nor a new trial in this matter, and I therefore deny their motion.

### I.

On April 16, 1997, plaintiff Charles Colegrove was injured while working at the Westvaco Paper Company's plant in Tyrone, Pennsylvania. Colegrove was rethreading paper on a large paper winding machine when he accidently stepped on an electric foot switch that activated the machine, causing his hand and forearm to be pulled into the machine and crushed. Defendant Allen Bradley ("A B") manufactured the foot switch in question, a Number 805–A4, Series D, specifically for use around heavy machines operated in plants or factories. Westvaco had apparently purchased the foot switch some time in 1979, either from A–B or one of A–B's distributors. Although A–B produced some foot switches with safety cover guards over the switch to prevent accidental activation, the switch Westvaco purchased and installed lacked a safety guard.

Following his injury, Colegrove commenced a strict liability action against A–

B.[1] At trial, Colegrove pursued two design defect theories under Restatement (Second) of Torts § 402A: first, that the A–B foot switch was defective because it lacked the safety cover guard that would have prevented accidental contact, and second, that the A–B foot switch was defective because of A–B's failure to provide any warnings of the danger of using the unguarded model around heavy machinery in a plant or factory. The jury concluded that Colegrove's injuries resulted from A–B's failure to warn Westvaco of the dangers associated with the unguarded foot switch and awarded Colegrove $350,000 for pain, suffering, past medical expenses and lost wages.

Pursuant to Federal Rule of Civil Procedure 50(b), A–B has now moved for judgment as a matter of law or for a new trial, raising several issues with respect to each request. Most of A–B's arguments are meritless and provide no basis for granting their motion. Nevertheless, I address each of those arguments briefly below. I consider at length A–B's argument that, as a manufacturer of a mere component part, it could have no legal duty to warn Westvaco of the dangers associated with using an unguarded foot switch on the paper winding machine. As I did before trial, I conclude that A–B's duty to warn is not limited in this case. Because I have determined that A–B is entitled neither to judgment as a matter of law nor to a new trial, I will deny their motion.

## II.

■■■ Any motion for judgment as a matter of law should be granted if "there is no legally sufficient evidentiary basis for a reasonable jury" to find in favor of one party on any issue. Fed. R. Civ. Proc.

50(a). "A motion for judgment as a matter of law should be granted only if viewing all the evidence in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." *Alexander v. Univ. of Pittsburgh Med. Ctr. Sys.*, 185 F.3d 141, 145 (3d Cir.1999); *see also Woodwind Estates v. Gretkowski*, 205 F.3d 118 (3d Cir.2000); *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir.1978) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."). Every legitimate inference from the evidence must be drawn in the light most favorable to the nonmoving party. *See Fultz v. Dunn*, 165 F.3d 215, 218 (3d Cir. 1998).

A–B raises several arguments in support of its request for judgment as a matter of law. First, A–B claims that Colegrove failed to prove at trial that A–B's alleged failure to warn of the danger from using its unguarded foot switch was a cause of Colegrove's accident. Second, A–B argues that it had no legal duty to warn Westvaco of any danger associated with the use of its unguarded foot switch on Westvaco's paper winding machine. Third, A–B argues that Westvaco's conduct here was a superseding cause of Colegrove's injuries. Finally, A–B claims that Colegrove failed to introduce any evidence at trial that an A–B foot switch was on the Westvaco machine at the time of Colegrove's injury.

### A.

■■■ A–B first argues that Colegrove failed to prove at trial that the lack of a warning was a cause of his injuries, and

---

1. Colegrove also sued the manufacturer of the paper winding machine, Cameron Machine Company (along with its successors in interest and various affiliates). Prior to trial, Colegrove settled with the Cameron defendants. *See* dkt. no. 71. A–B has an outstanding cross-claim against the Cameron defendants. *See* dkt. no. 55.

without such proof, A–B cannot be liable to Colegrove. To recover under § 402A, Colegrove must establish that the alleged defect was the proximate cause of his injuries. *See Pavlik v. Lane Limited/Tobacco Exporters International,* 135 F.3d 876, 881 (3d Cir.1998). As the Third Circuit put it in *Pavlik,* "To reach a jury on a failure to warn theory of liability, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury." *Id.* (citing *Conti v. Ford Motor Co.,* 743 F.2d 195, 197 (3d Cir.1984)). However, Colegrove is aided in making his case by a rebuttable presumption that a warning, if given, would have been heeded. *Id.* at 883 (predicting that the Pennsylvania Supreme Court will adopt this rule); *see also Coward v. Owens–Corning Fiberglas Corp.,* 729 A.2d 614, 621 (Pa.Super.1999) (holding that "a plaintiff should be afforded the use of the presumption that he or she would have followed an adequate warning"). To rebut this heeding presumption, A–B would need to introduce evidence that a warning would not have been heeded if it had been given; if A–B successfully rebutted the heeding presumption, then Colegrove would have to come forward with evidence that a warning would in fact have prevented his injuries. *See Pavlik,* 135 F.3d at 883–84.

A–B argues that it has rebutted the heeding presumption in two ways. First, it claims that Engineer George Snyder stated in his expert report that Westvaco was in violation of OSHA regulations regarding the unguarded foot switch. *See* dkt. no. 92 at 3; dkt. no. 98, at 2–3. According to A–B, this alleged OSHA violation rebutted the presumption that Westvaco would have heeded a warning about the foot switch if it had been given. Second, A–B argues that Colegrove himself was fully aware of the dangers posed by the foot switch and would not have modified his behavior had a warning been given. *See* dkt. no. 92 at 4–6; dkt. no. 98 at 4–5. In support of this argument, A–B cites several cases recognizing that the heeding presumption may be rebutted by evidence that a plaintiff was fully aware of the risk of bodily injury. *See Pavlik,* 135 F.3d at 881; *Overpeck v. Chicago Pneumatic Tool Co.,* 823 F.2d 751, 755 (3d Cir.1987); *Powell v. J.T. Posey Co.,* 766 F.2d 131, 134 (3d Cir.1985); *Conti,* 743 F.2d at 198. Having argued that the heeding presumption was rebutted and the burden of proof was shifted back to Colegrove, A–B then argues that Colegrove failed to introduce any additional evidence establishing that A–B's failure to warn was a substantial factor in his injury. *See* dkt. no. 92, at 4; dkt. no. 98, at 3–4. Specifically, A–B claims that the expert testimony stating that the failure to warn caused Colegrove's injuries was not sufficient to show causation because the expert's opinion was mere speculation. A–B thus contends that Colegrove has failed to establish causation and that A–B is entitled to judgment as a matter of law.

■ Neither of A–B's attempts to rebut the heeding presumption are successful. As for the failure to warn Westvaco, the only apparent evidence A–B cites is Westvaco's supposed violation of an OSHA regulation. This evidence is ineffective as a rebuttal to the heeding presumption because nothing demonstrates that Westvaco knew of the regulation and chose to ignore it. OSHA regulations and Westvaco's alleged violation of them were not admissible at trial because industry standards like OSHA regulations are not relevant to a § 402A action. *See Lewis v. Coffing Hoist Division,* 515 Pa. 334, 528 A.2d 590 (1987); *Sheehan v. Cincinnati Shaper Co.,* 382 Pa.Super. 579, 555 A.2d 1352, 1355 (1989). As A–B admits, the only mention of OSHA regulations is in Engineer George Snyder's

expert report.[2] *See* dkt. no. 92, at 3 n. 2. In that report, Snyder suggests that Westvaco was in violation of an OSHA regulation prohibiting unguarded foot switches around mechanical power presses. *See* Defendant's Exhibit 1–K, dkt. no. 93, ex. 4, at 3 (citing 29 CFR § 1910.217(b)(7)(x) (2001)). Nothing in Snyder's report, however, indicates that Westvaco knew of this regulation and failed to heed its requirements.

A–B simply concludes from the fact that Westvaco may have been in violation of this OSHA regulation that Westvaco would not have heeded a warning about the unguarded foot switch even if A–B had given one. But this conclusion does not follow. To rebut the presumption that Westvaco would have heeded a warning, A–B would need to show that Westvaco was informed of the danger of the unguarded foot switch and chose to disregard that information. Obviously, an applicable OSHA regulation would be one way Westvaco could be informed of the danger, but only if Westvaco actually knew of that OSHA regulation. A–B goes to some length to argue that Westvaco could violate the OSHA regulation without knowing of that regulation. *See* dkt. no. 92, at 3; dkt. no. 98, at 2–3. That may very well be true, but a mere violation of an OSHA regulation—without evidence that Westvaco *knowingly* violated the regulation—does not rebut the presumption that Westvaco would have heeded a warning if it had been given. So even if there were adequate evidence of record to show that Westvaco had violated this OSHA regulation, that is insufficient to rebut the heeding presumption without further evidence that Westvaco was aware of or knowingly in violation of the regulation. A–B does not point to any such evidence; in fact, it repeatedly states that it does not need such evidence. But such evidence is exactly what its rebuttal requires, and without it, the argument fails.

A–B's other attempt to rebut the heeding presumption—its argument that Colegrove knew of the danger associated with the foot switch—fails not only because it depends upon citations A–B takes out of context but also because it ignores the nature of Colegrove's strict liability theory. First, A–B claims that the heeding presumption may be rebutted by showing that a plaintiff was aware of the danger in question, a proposition for which it cites *Pavlik, Overpeck, Powell,* and *Conti. See* dkt. no. 92, at 4. Several of these cases do state that "one way the defendant can rebut [the heeding] presumption is by demonstrating that the plaintiff was previously fully aware of the risk of bodily injury posed by the product." *Pavlik,* 135 F.3d at 881; *see also Overpeck,* 823 F.2d at 755; *Powell,* 766 F.2d at 134. But A–B lifts this proposition out of the specific facts of those cases; in each of those cases, the only effective warning would have been one given to the plaintiff. *See Pavlik,* 135 F.3d at 882–84 (warning the plaintiff, who inhaled butane); *Overpeck,* 823 F.2d at 755 (warning the plaintiff, who was injured by a pneumatic tire changer); *Powell,* 766 F.2d at 133–34 (warning the plaintiff, a nurse who was injured when her patient untied a safety vest's straps). In such cases, where the relevant warning would have been one given to the plaintiff, it follows that the heeding presumption could be rebutted by showing that the plaintiff knew of the danger.

**2.** Snyder's report was not admitted at trial. *See* dkt. no. 72. Because the violation of the OSHA regulation is all that A–B points to as showing that Westvaco would not have heeded a warning if given, there is literally *no* evidence in the trial record to rebut the heeding presumption afforded to Colegrove. But even if Snyder's report is considered as a possible rebuttal, it is inadequate for that purpose.

It is hardly a general rule, however, that any plaintiff's awareness of a danger always rebuts the heeding presumption. Where the theory of a case is that the plaintiff's injury would have been prevented had the defendant warned a *third party*, evidence that the *plaintiff* was aware of the danger is irrelevant to the causal sequence and the heeding presumption cannot logically be rebutted by such evidence. *Conti* provides a useful example. In that case, the plaintiff wife was injured when she fell getting into her husband's Ford's Mustang; she lost her balance because the car lurched backwards when her husband started it without disengaging the clutch. *See Conti*, 743 F.2d at 196–97. Her theory in that case was that Ford should be strictly liable for its failure to warn her husband. The Third Circuit determined that Ford's failure to warn did not cause the wife's injuries because her husband was fully aware of the danger of starting the car without disengaging the clutch and no warning would have changed his conduct— in other words, the evidence indicated that the husband would not have heeded a warning if it had been given. *See id.* at 198. Notably, the court did not consider whether the plaintiff wife was aware of the danger, because her knowledge of the danger was not a relevant part of the alleged causal sequence. In other words, where the alleged cause of an injury is a defendant's failure to warn some third party, whether the plaintiff was aware of the danger is simply not a factor. A–B misinterprets the cases it cites; the heeding presumption can be rebutted by showing that the plaintiff was aware of the danger only where the injury was allegedly caused by a failure to warn the plaintiff. If the alleged cause of an injury was the failure to warn some third party, the plaintiff's awareness of the danger does not rebut the heeding presumption.

Colegrove has clearly alleged that the cause of his injury was A–B's failure to warn a third party, Westvaco. In its reply brief, A–B even acknowledges that "at no time during the trial did Plaintiff claim that A–B failed to warn *him* of the dangers associated with an unguarded foot switch. Instead, Plaintiff has claimed that it was a failure to warn *Westvaco*, and Westvaco only, that caused his injury." Dkt. no. 98, at 5. But A–B concludes from this that their warning, if given, would not have changed Colegrove's behavior, and therefore Colegrove has failed to show that A B's failure to warn was a cause of his injury. *See id.* A–B seems unable to comprehend Colegrove's strict liability theory. According to Colegrove, A–B should have warned Westvaco not to use an unguarded foot switch around its heavy machinery. *See* Transcript of March 13, 2001, dkt. no. 89, at 46.21–23. Had such a warning been given to Westvaco, Colegrove is entitled to presume that Westvaco would have heeded the warning and either installed a foot switch with a cover guard or not installed any foot switch at all. In either case, Colegrove's accident would not have occurred, and that is all Colegrove needs to establish causation. *See Pavlik*, 135 F.3d at 881; *Conti*, 743 F.2d at 198. Whether Colegrove would have altered his own behavior is simply beside the point.

To rebut the heeding presumption, what A–B would need is evidence showing that Westvaco, and not Colegrove, would have failed to alter its conduct had a warning been given. There is an important reason why the emphasis here is on Westvaco. As some courts have recognized, the heeding presumption is crucial in cases where the plaintiff was exposed to a defective product in the course of his employment under circumstances that provided no meaningful choice of whether to avoid that product. *See Coward*, 729 A.2d at 620 (citing *Coffman v. Keene Corporation*, 133

N.J. 581, 628 A.2d 710 (1993)).[3] In such cases, the plaintiff employee will usually need to rely on the heeding presumption in order to get to a jury. *See id.* To rebut the heeding presumption in such a case—where the employer made decisions about what equipment to use and how to use it, and the employee had no choice in the matter—a defendant must produce evidence that shows that the *employer,* not the *employee,* would not have heeded the warning if it had been given. In other words, a plaintiff employee's knowledge of the danger is not relevant to rebutting the presumption that his employer would have heeded a warning, if given, and that in doing so, the employer would have prevented its employee's injury. That is the situation here, so A–B's arguments about what Colegrove knew or was aware of are ineffective to rebut the presumption.

Because A–B has not successfully rebutted the heeding presumption, a jury may presume that Westvaco would have heeded a warning from A–B not to use its unguarded foot switch around heavy machinery. Because that presumption is sufficient for Colegrove to take his case to a jury, I do not need to address A–B's argument that there is no record evidence showing that Westvaco would have acted differently if a warning had been given, including A–B's argument that the opinion of Colegrove's expert was insufficient to establish causation because that opinion was mere conjecture. With the aid of the heeding presumption, Colegrove established the causation that is a necessary element of his strict liability claim. A–B is therefore not entitled to judgment as a matter of law on this point.

## B.

A–B asserts that as a matter of law it had no duty to warn Westvaco of the dangers associated with using its unguarded foot switch on heavy machinery. According to A–B, Pennsylvania law clearly limits a manufacturer's duty to warn of a danger when that manufacturer supplies only a component part that is assembled into a finished product by another, and the danger is associated with the use of the finished product. *See Wenrick v. Schloemann–Siemag, A.G.,* 523 Pa. 1, 564 A.2d 1244, 1247 (1989) (plurality opinion); *Jacobini v. V. & O. Press Co.,* 527 Pa. 32, 588 A.2d 476, 478 (1991) (*dicta*). Prior to trial, A–B had made this same argument in support of its Motion in Limine to Exclude Plaintiff's Expert Testimony, dkt. no. 35, as well as in its opposition to one of Colegrove's motions in limine. Dkt. no. 50.[4] I rejected this argument each time it was raised. *See* Order dated March 7, 2001, dkt. no. 54; Memorandum Opinion and Order dated March 8, 2001, dkt. no. 57; *see also* Transcript of Proceedings, March 9, 2001, dkt. no 85, at 13. I continue to think that A–B misstates Pennsylvania law when it claims to have no duty to warn Westvaco of the danger associated with its unguarded foot switch because the foot switch was a mere component in the paper winding machine that injured Colegrove. I therefore reject this argument.[5]

---

**3.** *Coffman,* the New Jersey case on which the *Coward* court relied, has been cited approvingly—albeit for a different but related proposition—by the Third Circuit in *Pavlik. See Pavlik,* 135 F.3d at 883 (citing *Coffman* ).

**4.** A–B's instant Brief specifically references the first of these arguments. *See* dkt. no. 92, at 6 n. 3.

**5.** I find no error in the reasoning of my earlier Memorandum Opinion and Order of March 8, 2001, dkt. no. 57, which addressed this issue. To the extent I fail to discuss instantly certain arguments considered in that Opinion, I incorporate such discussion herein.

Despite having already addressed this issue, I write again for several reasons. As I stated at trial, products liability law in Pennsylvania is often impenetrable because it has developed in fits and starts, leading to "seemingly peculiar evidentiary results that emanate simply from the profound difference between a negligence regime and a strict liability regime." See Transcript of March 9, 2001, Dkt. no 85, at 16. With respect to the specific issue at hand, there is no authoritative case from the Pennsylvania Supreme Court that explains the boundaries of the supposed limitation on a component part manufacturer's duty to warn. Of the two Pennsylvania Supreme Court opinions addressing this issue, one is a mere plurality opinion and the other discusses the principle only in *dicta*. As with much Pennsylvania products liability law, the scope of a component part manufacturer's duty to warn has been developed primarily by the federal courts, operating in predictive mode. The Third Circuit has opined on the limitation of a component part manufacturer's duty to warn on three occasions. *See Petrucelli v. Bohringer and Ratzinger,* 46 F.3d 1298 (3d Cir.1995); *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107 (3d Cir.1992); *J. Meade Williamson and F.D.I.B., Inc. v. Piper Aircraft Corp.,* 968 F.2d 380 (3d Cir.1992). However, these opinions point in different directions and fail to give consistent guidance as to the exact breadth of the limitation on the duty to warn. Finally, the factual similarity between the instant case and the *Wenrick* case on which A–B principally relies requires my more detailed attention. There are several important distinctions between this case and *Wenrick,* so it is necessary to distinguish that plurality opinion from the case before me.

In addressing this issue again, my objective is to make this particular aspect of Pennsylvania products liability jurisprudence—as it currently exists—less obscure. Regardless of the success of my efforts, complete clarity will be achieved only when the Pennsylvania Supreme Court ultimately settles this area of law.

To begin, there are but two cases from the Pennsylvania Supreme Court on the issue of a component part manufacturer's duty to warn. The fountainhead case is *Wenrick v. Schloemann–Siemag, A.G.,* 523 Pa. 1, 564 A.2d 1244, 1247 (1989). In that case, Wenrick was killed while he repaired an extrusion press manufactured by Schloemann–Siemag (SMS). He was crushed when the hydraulic loader under which he was standing retracted. The loader ordinarily retracted when another part of the machine triggered a particular switch; circumstantial evidence produced at trial indicated that this switch, which was located near the access stairs into a service pit below the machine, was inadvertently tripped by another worker descending the steps. Wenrick's wife sued SMS and Cutler–Hammer, the manufacturer of the electrical control system for the machine. She eventually settled with SMS but proceeded to trial on both negligence and strict liability claims against Cutler–Hammer, alleging that the switch activating the loader was defective because of "the unguarded condition of the switch and the proximate location of the switch relative to the steps." *Id.,* 564 A.2d at 1246. She also claimed that Cutler–Hammer ought to have warned SMS of the danger of locating the switch near the steps. A jury returned a verdict in her favor, but a plurality [6] of the Pennsylvania

---

6. Two of the seven justices of the Pennsylvania Supreme Court did not participate in the *Wenrick* decision. *See Wenrick v. Schloemann–Siemag A.G.,* 523 Pa. 1, 564 A.2d 1244, 1248 (1989). Two others dissented. *See id.*

The Supreme Court subsequently treated this opinion as a plurality decision. *See Jacobini v. V. & O. Press Co.,* 527 Pa. 32, 588 A.2d 476, 478 (1991) (citing *Wenrick* as a "plurality opinion").

Supreme Court ultimately upheld a lower court's decision to grant Cutler–Hammer judgment n.o.v. The Supreme Court reasoned that Cutler–Hammer had no control over nor any knowledge of the placement of the switch near the maintenance steps. As such, it could not be strictly liable for a defective product. *See id.* at 1247. In addition, Cutler–Hammer was under no duty to warn SMS of the danger created by the position of the switch because Cutler–Hammer had not placed the switch there. The Supreme Court refused to sanction the "radical restructuring of social obligations" that would result from imposing on Cutler–Hammer a duty to warn of a danger it had in no way created. *Id.* at 1248.

A–B reads *Wenrick* as standing for the general proposition that a component part manufacturer is under no duty to warn of a danger when that danger comes from a finished product into which the component is incorporated. *See* dkt. no. 92, at 7 n. 4. In fact, the *Wenrick* Court never stated such a proposition and instead decided the case narrowly, based upon the particular evidence adduced at trial. Specifically, the Court stated that it had scrutinized the entire record and found no evidence that Cutler–Hammer had any indication that the switch activating the hydraulic loader would be placed near the stairs. *See id.* at 1246–47. Because the alleged defect included "the proximate location of the switch relative to the steps," *see id.* at 1246, Cutler–Hammer could not be liable if it were completely uninvolved in placing the switch relative to the steps. Similarly,

Cutler–Hammer could not be liable for a failure to warn of the danger caused by the proximity of the switch to the stairs because the plaintiff had adduced no evidence showing that Cutler–Hammer had played any role in creating that danger. *See id.* at 1248. The court's decision did not turn on any general principle that applied to component part manufacturers like Cutler–Hammer. Rather, Cutler–Hammer was not liable in *Wenrick* simply because the plaintiff had failed to make out her case.

It subsequent cases, however, *Wenrick* began to be cited for a general principle of products liability—a principle never stated in *Wenrick* itself—that a component part manufacturer had no duty to warn of dangers associated with the finished product into which its component was incorporated. This generalized interpretation of *Wenrick* first appeared, in *dicta*,[7] in the other Pennsylvania Supreme Court case on this issue, *Jacobini v. V. & O. Press Co.*, 527 Pa. 32, 588 A.2d 476 (Pa.1991). There, plaintiff Jacobini was injured when the power press he operated expelled a die and materials being shaped by the die. He then sued the manufacturer of the press and the manufacturer of the die. Jacobini also sued Danly Machine Corporation, the manufacturer of the die set, which was incorporated into the completed die as a foundation to which the die was attached. At trial, Jacobini proceeded solely on a strict products liability claim. The evidence showed that at one point the machine had A–Barrier guard which would have pre-

---

**7.** As I explained fully in my March 8, 2001 Opinion, *see* Dkt. no. 57, at 5, *Jacobini* was decided on a causation issue; the Court found there to be insufficient evidence that a warning, if given, would have prevented the plaintiff's injury. *See Jacobini*, 588 A.2d at 479. The Pennsylvania Supreme Court reached the issue of the limits on the component part manufacturer's duty to warn only by assum-

ing *arguendo* that the causation issue was not dispositive. *See id.* As the *Jacobini* Court explained, "the case *sub judice* can be viewed . . . as not requiring a precise application of [the "*Wenrick* principle"], on the basis that the evidentiary record was simply not sufficient to support submission of a 'failure to warn' theory to the jury." *Id.* at 478.

vented Jacobini's injuries, but this guard had been removed. Jacobini's theory was that each manufacturer should have included with its product a warning to use the products only with a barrier guard attached, and that the failure to warn rendered the products unreasonably dangerous and therefore defective. On Danly's appeal, the Supreme Court concluded that Danly could not be liable because Jacobini's evidence was inadequate to support a verdict. His expert testified only that Danly should have warned of the need for a point of operation guard, a different safety device that would not have prevented Jacobini's injury. As such, Jacobini failed to show that Danly's failure to warn was a cause of his injuries, so Danly could not be liable. *See id.*, 588 A.2d at 479. The Court went on to consider, hypothetically, whether Danly's duty to warn was limited because Danly was a manufacturer of a "mere component of a final product," *id.* (citing *Wenrick* ), and concluded that, because of this limit, Danly might not be liable even if the plaintiff had produced adequate evidence to support her claim.

Having cited *Wenrick* as a basis for limiting a component manufacturer's duty to warn, the *Jacobini* Court explained this limitation in terms of foreseeability. "Danly cannot be expected to foresee every possible risk that might be associated with use of the completed product, the die, which is manufactured by another party, and to warn of dangers in using that completed product in yet another party's finished product, the power press." *Id.* at 480. The Court reasoned that requiring Danly to foresee all possible dangers created through this chain of independent actions would carry a component part manufacturer's duty to warn to an extreme. Furthermore, the Court stated that "[t]his is especially true where the component itself is not dangerous, and where the danger arises from the manner in which the component is utilized by the assembler of the final product, this being a manner over which the component manufacturer has no control." *Id.* at 479. Danly's role in creating the danger was too attenuated, so Danly could not be required to foresee that danger and warn of it.

This limit on a component manufacturer's duty to warn has received no additional treatment from the Pennsylvania Supreme Court. The federal courts, however, have confronted the *"Wenrick* principle" and been forced to predict its actual breadth. In *Petrucelli v. Bohringer and Ratzinger,* 46 F.3d 1298 (3d Cir.1995), for example, the Third Circuit discussed *Wenrick* along the way to concluding that a component part manufacturer was not liable for a failure to warn of a danger it could not have reasonably foreseen. In that case, plaintiff Petrucelli's arm was amputated when it was pulled into a discharge conveyer belt on a recycling machine; the machine had been designed and built by Jake Diel Construction Machinery and included a rotor crusher made by defendant Bohringer and Ratzinger. Petrucelli was not injured by Bohringer and Ratzinger's rotor crusher, but he argued that this component of the finished machine was defective because it lacked warning systems that would alert someone standing near the discharge conveyer when the machine was turned on. According to the Third Circuit, "the question before us is whether it is reasonably foreseeable to a component manufacturer that failure to affix warning devices to its product would lead to an injury caused by another component part, manufactured by another company, and assembled into a completed product by someone other than the initial component manufacturer." *Id.* at 1309. The court held that Bohringer and Ratzinger could not be expected to foresee the danger from the discharge conveyer—which it did not manufacture or assemble with its own rotor crusher—and

therefore could not be liable for failing to warn of this danger. *See id.* The crucial step in the court's analysis was the fact that the danger from the discharge conveyer that caused Petrucelli's injury was not foreseeable to Bohringer and Ratzinger, and therefore Bohringer and Ratzinger's duty to warn of that danger was limited.[8]

In two other Third Circuit cases, however, the court did not limit the component part manufacturers' duties to warn. In *J. Meade Williamson and F.D.I.B., Inc. v. Piper Aircraft Corp.*, 968 F.2d 380 (3d Cir.1992), the court distinguished *Wenrick* and *Jacobini* in denying a motion for judgment as a matter of law. The case arose out of the crash of a Piper aircraft in which two occupants died and two were seriously injured. Plaintiffs sued Piper, who manufactured the airplane, and Parker Hannifin Corporation, who made a standby vacuum pump believed to have been part of the cause of the crash. The theory was that (1) a defective design of the vacuum pump joint used to attach the pump to the aircraft's engine, (2) inadequate installation, and (3) inadequate installation instructions contributed to the failure of the aircraft's engine, resulting in the crash. The Third Circuit rejected Parker's assertion that it was entitled to judgment as a matter of law because, as the manufacturer of the vacuum pump that was a component in Piper's aircraft, it

could not be liable for its failure to warn Piper in the installation instructions of dangers associated with improper installation. Parker argued, based on *Wenrick* and *Jacobini*, that it had no duty to warn Piper, but the Circuit Court "d[id] not believe these cases support that proposition as broadly as Parker state[d] it." *Williamson*, 968 F.2d at 385. Rather, the Third Circuit predicted that the Pennsylvania courts "will not extend [*Wenrick*] to a supplier of a component who fails to give the manufacturer of the completed product warning or instruction about dangers inherent in the component's design that the manufacturer would not readily recognize." *Id.* at 387. Because the dangers associated with the incorrect installation of a vacuum pump would not have been apparent to Piper, Parker could not be relieved of its duty to warn. In effect, *Williamson* appeared to cabin *Wenrick* within the rule that there is no duty to warn of open and obvious dangers.[9]

Although *Williamson* departed from the foreseeability inquiry employed in *Petrucelli*, the last Third Circuit case discussing *Wenrick* was more consistent with *Petrucelli's* analysis. In *Fleck v. KDI Sylvan Pools*, 981 F.2d 107 (3d Cir.1992), plaintiff Richard Fleck dove head first into a three-foot deep pool, broke his neck, and was rendered a quadriplegic. The pool had been fitted with a replacement liner that lacked warnings of the pool's depth.

**8.** A–B never cites the Third Circuit's opinion in *Petrucelli*. Instead, in one of its earlier briefs on this issue, A–B cites only the District Court's opinion that preceded the Third Circuit's ruling. *See* dkt. no. 50, at 2 (citing *Petrucelli v. Bohringer & Ratzinger*, 1994 WL 81999 (E.D.Pa.)). The Third Circuit affirmed Judge Troutman's grant of summary judgment to Bohringer and Ratzinger, but Judge Troutman's opinion did not emphasize the foreseeability analysis that was central to the Circuit Court's reasoning. Rather, Judge Troutman interpreted Pennsylvania law to include the general principle that "[a] compo-

nent manufacturer does not have to warn of dangers associated with the finished product." *Petrucelli*, at \*6. In its own opinion, the Third Circuit did not take such A Broad view of Pennsylvania law.

**9.** *See, e.g., Sherk v. Daisy–Heddon*, 285 Pa.Super. 320, 427 A.2d 657, 660 (1981), *rev'd on other grounds*, 498 Pa. 594, 450 A.2d 615 (1982) (stating that there is no duty to warn of open and obvious dangers); *Ellis v. Chicago Bridge & Iron Co.*, 376 Pa.Super. 220, 545 A.2d 906, 911–12 (1988).

Among other defendants, Fleck sued Hoffinger Industries, the manufacturer of the replacement liner, claiming that the replacement liner was defective because it lacked depth warnings. Hoffinger argued that its replacement liner was a component part later incorporated into a final product, so it had no duty to warn under the principle of *Wenrick* and *Jacobini*. The Third Circuit reasoned that the danger from a replacement liner lacking depth warnings was foreseeable to the manufacturer of that component, so the component manufacturer did have a duty to warn. *See id.* at 118. Indeed, a replacement pool liner had but one use—to be incorporated into a complete pool—so that use and its attendant dangers were reasonably foreseeable to Hoffinger.

The Third Circuit in *Fleck* also made two further observations about Pennsylvania's supposed limitation on a component manufacturer's duty to warn. First, the limitation in *Wenrick* and *Jacobini* probably applies to only a "generic component part," *id.;* where something is "really a separate product with a specific purpose and use," *id.,* the *Wenrick* principle is inapplicable. "Surely if the maker of such things as brake systems, elevators, and artillery firing pins, are not immune from liability simply because those products are

later incorporated into something else, Hoffinger is likewise not immune from liability." *Id.*[10] Second, the court refused to accept Hoffinger's contention that for strict liability to apply, the allegedly defective product itself had to be the efficient cause of the plaintiff's injury. As the court reasoned, "even dynamite is inert, unless ignited. Although a replacement pool liner does not explode, crush, drive, or exert any other physical force, it may through a chain of not so remarkable events cause serious injuries." *Id.* at 119. In addition to rejecting Hoffinger's defense based on *Wenrick* and *Jacobini,* the *Fleck* court separately considered and rejected Hoffinger's defense that the danger of diving into a shallow pool was open and obvious, thereby relieving it of its duty to warn of the danger. *See id.* at 119–20.

The discussions of the open and obvious danger rule in *Fleck* and *Williamson,* when juxtaposed with the foreseeability analysis in *Petrucelli* and *Fleck,* point to the major source of confusion regarding the component manufacturer's duty to warn. On the one hand, where a component part manufacturer can foresee a use of its product that will create a certain danger, the manufacturer has a duty to warn of that danger. *See, e.g., Jacobini,* 588 A.2d at 480. On the other

---

**10.** Distinguishing a "generic" or "mere" component from a "separate product with a specific purpose and use" is no easy task. Component parts exist on a continuum. At one extreme, there are parts specifically manufactured as components for some other finished product; the vacuum pump in *Williamson* appears to be an example of one such part. Such components are "separate products with a specific purpose and use"—namely, the use for which they were designed to be incorporated into the finished product. At the opposite extreme of the component part continuum are truly generic parts that are almost completely fungible and have no real use alone; examples would be bolts, nuts, screws and the like. Between these two ex-

tremes might be components like the replacement pool liner in *Fleck,* which was not specifically manufactured for incorporation into a particular finished product but had only a single kind of use. Another intermediate class of component parts would be items with multiple uses within a limited range; a simple handle is an example of just such a component. Precisely where on this continuum a given component fits might be helpful in determining whether the manufacturer of that component has a duty to warn of dangers associated with it. But because component parts exist on such a continuum, it may not be useful to make the distinction between a mere component and a separate product the dispositive issue in actual cases.

hand, where the danger is open and obvious, the manufacturer has no duty to warn. *See, e.g., Sherk v. Daisy–Heddon,* 285 Pa.Super. 320, 427 A.2d 657, 660 (1981), *rev'd on other grounds,* 498 Pa. 594, 450 A.2d 615 (1982) (no duty to warn if danger is open and obvious). Of course, there will be some cases in which a danger both results from a foreseeable use and is open and obvious.[11] In such cases, the two tort principles appear to come into conflict, but that conflict is not a real one. The open and obvious danger rule is properly understood as an exception to the usual duty to warn. Because the manufacturer's duty to warn attaches only to dangers associated with product uses that are deemed to be foreseeable, foreseeability is an inherent part of a prima facie case based on a failure to warn theory. The open and obvious danger rule becomes relevant only after a plaintiff has made out a prima facie case, which must include a showing that the relevant use was foreseeable.

Strict liability actions against the manufacturer of a component part frequently implicate both the foreseeable use test and the open and obvious danger test. *See, e.g., Fleck,* 981 F.2d at 119–20; *Williamson,* 968 F.2d at 387–88 (citing *Mackowick v. Westinghouse Elec. Corp.,* 525 Pa. 52, 575 A.2d 100 (1990)).[12] The resulting theoretical conflict in such cases is responsible for some of the difficulties in interpreting *Wenrick's* limitation on a component part manufacturer's duty to warn.[13] The best interpretation of *Wenrick,* however, is to reduce the limitation on a component part manufacturer's duty to warn primarily to an inquiry into whether the relevant use was foreseeable to the manufacturer. This is not to say that the open and obvious danger rule has no application in cases involving component part manufacturers.[14] Rather, in determining whether *Wenrick's* limitation on the liability of a component manufacturer for a failure to warn applies in any case, the question of whether the

11. This is not always the case, however. Foreseeable uses and open and obvious dangers are not isomorphic concepts because the foreseeable use test inquires primarily into the *uses* of a product, while the open and obvious danger rule examines the nature of the *danger* that results from those uses.

12. *Williamson's* discussion of *Mackowick v. Westinghouse Elec. Corp.,* 525 Pa. 52, 575 A.2d 100 (1990), alongside *Wenrick* and *Jacobini* is revealing. *Jacobini's* discussion of a component manufacturer's duty to warn is carried out in terms of foreseeability, and *Wenrick* is also explicable in terms of foreseeability. *Mackowick,* however, says nothing about component parts and focuses instead on whether the danger that resulted in the plaintiff's injuries was recognizable. *See Mackowick,* 575 A.2d at 103. The *Williamson* court did not identify the different emphases in the cases, further illustrating the extent of the confusion in this area of products liability law.

13. The task of interpreting *Wenrick* is made more difficult by the nettlesome causation problems that arise when a component part manufacturer is involved. Many cases show

that component manufacturers were frequently held to be not liable because their components played no causal role in the plaintiffs' injuries; the fact that their products were mere component parts was only incidentally related to the causal analysis. For example, the *dicta* in *Jacobini* raises the issue of Pennsylvania's limitation on a component manufacturer's duty to warn, but in the section of the *Jacobini* opinion that is *ratio decidendi,* the court found that Danly could not be liable to the plaintiff because the plaintiff had not established the necessary causation. *See Jacobini,* 588 A.2d at 479 ("it cannot be said that the failure to warn ... was a cause of the injuries sustained"). Similarly, *Petrucelli* was decided in part on a causation issue. *See Petrucelli,* 46 F.3d at 1309 (finding "no causal relationship between [the defendant's] product and the accident").

14. Indeed, the jury in the instant case was instructed on open and obvious dangers, *see* dkt. no. 90, at 50, and A–B's challenge to the propriety of my jury instruction is discussed *infra,* Part III.C.

danger in question was open and obvious is subordinate to the primary inquiry into whether the relevant use was foreseeable.

Foreseeability must be the crux of the *Wenrick* principle because this concept is present, implicitly or explicitly, in all the cases addressing a component part manufacturer's duty to warn. The Pennsylvania Supreme Court's dicta in *Jacobini* is explicit in its use of foreseeability. *See Jacobini*, 588 A.2d at 480 ("Danly cannot be expected to *foresee* every possible risk that might be associated with use of the completed product, the die, which is manufactured by another party, and to warn of dangers in using that completed product in yet another party's finished product, the power press." (emphasis added)). The Third Circuit's opinions are equally clear in their reliance on foreseeability in limiting the *Wenrick* principle. In *Fleck*, Hoffinger had a duty to include depth warnings on its replacement pool liner because it could "reasonably *foresee* the potential risk of failing to affix warning labels." *Fleck*, 981 F.2d at 118 (emphasis added). *Petrucelli* similarly depended upon a foreseeability analysis. *See Petrucelli*, 46 F.3d at 1309 ("[T]he question before us is whether it is reasonably *foreseeable* that failure to affix warning devices to its product would lead to an injury . . . ." (emphasis added)). Moreover, those cases that do not explicitly discuss foreseeability are readily explained by means of that concept. For example, *Williamson* appears to have found that the component manufacturer, Parker, had a duty to warn because the danger from an improper installation of its vacuum pump on the Piper aircraft was not open and obvious. *See Williamson*, 968 F.2d at 387 (citing the fact that the dangers were not "readily recognizable"). At the same time, the court must have assumed without discussion that Parker could reasonably foresee the use to which its vacuum pump was put, because without that antecedent element,

the open and obvious danger rule would be irrelevant. In fact, Parker designed and built the vacuum pump specifically for Piper, so there could be no question that Piper's use of this component was foreseeable. *See id.* at 383. Perhaps more importantly, *Wenrick* itself is explicable in terms of foreseeability. The alleged defect in *Wenrick* was a combination of the position of the switch near a set of maintenance steps and the switch's lack of a guard, which made it possible for someone to accidentally activate the machine while descending the stairs. *See Wenrick*, 564 A.2d at 1246. The Court determined that Cutler Hammer, the defendant who had manufactured the switch as a component for the machine, played no part in locating the switch, *see id.* at 1247, so it could not have reasonably foreseen that the switch would be positioned near the steps, thereby creating a duty to warn of the danger that the switch could be triggered accidentally. Because the use of its component near these stairs was not foreseeable, Cutler Hammer had no duty to warn. Taken together, *Wenrick*, *Williamson*, *Petrucelli*, *Fleck*, and *Jacobini* all show that under the best interpretation of Pennsylvania law, a component part manufacturer is relieved of its duty to warn only when the use to which its component was put was not foreseeable to the manufacturer. Emphasizing the foreseeability analysis in these cases makes the most sense out of the nebulous jurisprudence in this area.

■■■ It is true that confusion can arise from the application of a negligence concept, like foreseeability, in the strict liability setting. This is especially so because the Pennsylvania Supreme Court has cautioned that "foreseeability is a test of negligence that is irrelevant in the context of strict liability." *Griggs v. BIC Corp.*, 981 F.2d 1429, 1435 (3d Cir.1992), *abrogated on other grounds by Surace v. Caterpillar*,

*Inc.,* 111 F.3d 1039 (3d Cir.1997). Nonetheless, as one Pennsylvania court has observed, "The liability arising from inadequate warnings is not 'strict' in the same sense as liability arising from a defect due to fault in manufacture, since a determination of whether an object is unreasonably dangerous without adequate warnings, and thus defective, necessarily involves negligence principles such as reasonableness and foreseeability." *Ellis v. Chicago Bridge & Iron Co.,* 376 Pa.Super. 220, 545 A.2d 906 (1988); *see also Parks v. Allied-Signal, Inc.,* 113 F.3d 1327, 1331–32 (3d Cir.1997); *Sweitzer v. Dempster Systems,* 372 Pa.Super. 449, 539 A.2d 880, 882 (1988). Indeed, the Supreme Court's *Jacobini* opinion invokes foreseeability in the context of strict liability. *See Jacobini,* 588 A.2d at 480.

■ Not only does the foreseeability analysis make the most sense of the cases, it also supports the policy behind strict liability based upon a failure to warn: that the entity that is best able to warn consumers of the dangers inherent in the product should be liable for failing to do so. "The role of foreseeability in a product liability case is consistent with the broad and sound social policy underlying § 402A; that is, as between an innocent user of a product and a manufacturer or seller who is engaged in the business of manufacturing or selling a product, risk of loss for injuries resulting from the use of a defective product shall be borne by the manufacturer and/or seller." *Sweitzer,* 539 A.2d at 882; *see also Parks,* 113 F.3d at 1331–32. Where a particular use is foreseeable to a manufacturer of some product, that manufacturer is the entity that is best able to warn of the dangers associated with that use. In a situation where a manufacturer is producing a mere component part, the manufacturer is under the same duty to warn of dangers associated with those uses of the component that

are foreseeable to the component's manufacturer.

Having determined that a component part manufacturer's liability for a failure to warn is limited by a principle of foreseeability, the remaining question is the appropriate level of generality at which to determine whether a use was foreseeable. A–B argues that "the real and dispositive question is whether the [component part] manufacturer knows of the *specific use* for which its product will *ultimately* be used." Dkt. no. 92, at 8 (emphases added). As they interpret the relevant cases, a component manufacturer's knowledge of the general uses to which its product might be put does not make those uses foreseeable, thereby creating a duty to warn. A–B distinguishes *Fleck,* for example, by emphasizing the fact that the pool liner had only one purpose. *See* dkt. no. 92, at 7 n. 5 (quoting *Fleck,* 981 F.2d at 118 ("Hoffinger knew that its liner would ultimately be incorporated into a pool, and nothing else....")). *Jacobini* is similar, according to A–B, because Danly did not know that its die set would be incorporated into the particular machine that injured the plaintiff, even though Danly knew generally that its die set would be incorporated into a die. *See* dkt. no. 92, at 7–8.

■ A–B attempts to circumscribe the scope of foreseeability too narrowly. It is difficult, in the abstract, to determine precisely how specific a manufacturer's knowledge of some component's use would have to be before that use would be foreseeable, because that is a fact-specific determination that always turns on details about a particular component. At present, it is enough to say that, although knowledge of the specific end use to which a component part will ultimately be put may be sufficient for showing that use to be foreseeable, such knowledge is by no means necessary to foreseeability. Where a component manufacturer produces a

product that has multiple uses, each of those uses is foreseeable even though the manufacturer does not know to which specific use from among the multiple uses the component will ultimately be put. For example, a manufacturer who produces automobile brakes that can be used on any car cannot claim that the use of those brakes on a particular model automobile was not foreseeable simply because the manufacturer did not know that its brakes would ultimately be used on that model. While it may be impossible to determine *a priori* the exact level of generality at which foreseeability must be determined, foreseeable uses are not limited, as A–B would insist, to the specific end uses to which a product is put.

It is worth summarizing this interpretation of Pennsylvania's purported limitation on a component manufacturer's duty to warn. Much confusion has resulted in the interpretation of Pennsylvania's law in this area because of the interaction between the requirement that a product's use be foreseeable before a duty to warn arises and the separate exception that there is no duty to warn of open and obvious dangers. In the case of a component part manufacturer, the critical inquiry is whether the manufacturer could foresee the use to which the component was put when incorporated into the finished product of another. Only if the component's use was foreseeable does the manufacturer of that component have a duty to warn of dangers associated with the component. And foreseeable uses of components are not limited to only the specific end use to which a component is ultimately put. Under this interpretation, Pennsylvania's limitation on a component manufacturer's duty to warn is less a special principle of products liability law that applies only to component part manufacturers than it is an application of general principles of strict liability. As such, holding a component manufacturer liable under these principles is not even

close to the "radical restructuring of social obligations" that the *Wenrick* court feared. *Wenrick,* 564 A.2d at 1248. Any imposition of strict liability restructures social obligations, and requiring a component part manufacturer to warn of dangers associated with its product is no more radical than applying strict liability in the first place.

■ All that remains, then, is to apply this statement of Pennsylvania's law to the facts before me. The A–B product at issue in this case was a switch, and because any switch will be used to turn something on or off, that use of the switch was foreseeable to A–B. But A–B's switch was not a switch *simpliciter;* it was a *foot* switch. A foot switch is designed to be activated by one's foot, which in turn means that the foot switch will almost certainly be positioned on a floor. A–B even advertised that the treadle of its foot switch was close to the floor to reduce operator fatigue. *See* dkt. no. 41, ex. A. It follows that the use of the foot switch on the floor was foreseeable to A–B. Moreover, A–B manufactured its Number 805–A4, Series D foot switch specifically for use in plants or factories, presumably to activate the heavy machinery found in such environments. In fact, among the uses for which A–B advertised its foot switch were "operating riveting, welding, and tire machines, punch presses, bending brakes, and many other types of machine tools." *Id.* It follows that A–B could foresee the use of its foot switch to activate heavy equipment on the floor of a manufacturing plant. Because such a use was foreseeable, A–B had a duty to warn of the danger of using the unguarded version of its foot switch around potentially dangerous machinery, where the accidental activation of the switch could result in injury to someone, like Charles Colegrove. To say that A–B had no duty to warn Westvaco of this danger simply because A–B manufactured only a component part is to misinterpret Pennsylvania law.

Despite A–B's arguments to the contrary, *Wenrick* does not govern this case because the alleged defect there was significantly different than the alleged defect here. In *Wenrick*, the plaintiff's expert testified that the defect that caused the injury was the "unguarded condition of the switch *and the proximate location of the switch relative to the steps.*" *Wenrick*, 564 A.2d at 1246 (emphasis in original).[15] The switch in *Wenrick* was designed to be tripped by another part of the machine, so the particular placement of the switch was important to the machine's functioning. The danger in *Wenrick* was that an unguarded switch placed near the maintenance stairs could be accidentally activated by someone descending those stairs; absent that particular placement of the switch, there was no danger of accidental activation. It follows from this that, in order for the manufacturer of the switch to have a duty to warn of this danger, the manufacturer had to be able to foresee that the switch would be placed near the stairs. Unfortunately for the plaintiff in *Wenrick*, she could produce no evidence that Cutler–Hammer knew anything about the placement of their switch on the machine, so Cutler–Hammer could have no duty to warn of dangers associated with the placement.

In the present case, A–B has tried mightily to argue that the location of their foot switch at a particular place on Westvaco's paper winding machine was germane to the danger here. When this issue was raised before trial by two motions in limine, A–B always emphasized the relevance of the location of its foot switch and compared this fact with the facts in *Wenrick*. *See* dkt. no. 35, at 5 ("A–B had no indication of how the foot switch would be used or where it would be placed by the ultimate user."); dkt. no. 50, at 6 ("A–B had no involvement in or knowledge of where the foot switch would ultimately be located."). Unfortunately for A–B, Colegrove's theory in this case did not depend upon the placement of the switch, and A–B is not entitled to rewrite that theory to make it more similar to the defect alleged in *Wenrick*.[16] Moreover, Colegrove's theory is not simply an artfully alleged defect designed to distinguish this case from *Wenrick*. Instead, Colegrove's theory reflects the relative unimportance in this case of the switch's location. The location is unimportant here because, unlike in *Wenrick*, the switch is a foot switch which will always be positioned somewhere on the floor. When an unguarded foot switch is positioned on a floor, there is always a danger that someone will accidentally step on the switch, and that danger exists wherever the switch happens to be located. It is true in this case that Colegrove was injured because he accidentally stepped on the foot switch, which had been placed in a particular location to make it convenient for Colegrove to activate the machine by means of that switch. But even if the foot switch had been located somewhere else, another person in the Westvaco plant might have accidentally stepped on the

---

**15.** In an earlier brief, A–B agreed with this characterization of the alleged defect in *Wenrick*. *See* dkt. no. 50, at 3 ("The court determined [in *Wenrick* ] that the alleged defect was the placement/location of the switch in relation to the access steps.").

**16.** At the pre-trial conference on February 27, 2001, it should have been clear to A–B that Colegrove's theory of the case had nothing to do with the location of the foot switch. *See* Dkt. no. 87, at 5, 21, 34. Indeed, I could not have been much more explicit about what Colegrove's theory was: "[The foot switch] is in its state defective because it lacks a guard. The defense keeps trying to shift the ground. The defense keeps saying well, the defect has to do with the placement of this.... [B]ut the defense can't rewrite the plaintiff's theory of the case." *Id.* at 21.

switch, activating the machine and injuring Colegrove. The danger, then, has less to do with the specific location of the switch than it does with the fact that an unguarded foot switch might always be activated accidentally. And because the use of its foot switch on a factory floor was foreseeable to A–B, A–B had a duty to warn of the danger associated with using the switch without a guard. This is a crucial distinction between this case and *Wenrick*, and A–B therefore cannot hide behind *Wenrick* to avoid liability for its failure to warn in this case.

I conclude, therefore, that it was foreseeable to A–B that its foot switch would be used on the floor of a factory to operate industrial equipment. As such, there would always be a danger that an unguarded foot switch would be accidentally triggered, thereby activating heavy machinery that might injure someone. A–B had a duty to warn of the danger of using its unguarded foot switch in such a manner, and it is not entitled to judgment as a matter of law on this issue.

### C.

A–B also asserts, for a second time, that Westvaco was a superseding cause of Colegrove's injury. I rejected this argument prior to trial and precluded A–B from introducing evidence that Westvaco's conduct rendered Westvaco a superseding cause. *See* Memorandum Opinion and Order of March 16, 2001, dkt. no. 77. For the reasons stated in my earlier opinion, I reject A–B's argument. Because Westvaco's conduct was not a superseding cause of Colegrove's injuries, A–B is not entitled to judgment as a matter of law on this issue.

### D.

Finally, A–B contends that Colegrove failed to introduce any evidence that an A–B foot switch had been installed on the Westvaco paper winding machine at the time of Colegrove's injury. *See* dkt. no. 92, at 11–12. Specifically, A–B claims that Colegrove's only evidence on this point was a photograph of an A–B foot switch taken by one of his experts, and that there was no evidence presented as to when or where the photograph was taken. *See id.* at 12. In response, Colegrove quotes extensively from the trial transcript, showing that he introduced circumstantial evidence that was adequate to support a jury finding in his favor.[17]

Colegrove's evidence at trial consisted of a series of inferential steps connecting an A–B foot switch to Westvaco's paper winding machine. First, Colegrove himself testified that Plaintiff's Exhibit 36—a photograph of the foot switch taken by a defense expert—depicted the foot switch on the Westvaco machine as it was on the date of his accident. *See* Transcript of March 12, 2001, dkt. no. 88, at 81–82. Next, Colegrove's expert, Engineer George Snyder, identified Exhibit 36 as a photograph of a foot switch, "reputedly the one at Westvaco that Mr. Colegrove stepped on accidentally when he had his accident." Transcript of March 13, 2001, dkt. no. 89, at 24. Then, Snyder identified Plaintiff's Exhibit 63—a photograph he took—as showing an identification tag riveted to a foot switch case. *See id.* at 29. This identification tag clearly indicated that A–B manufactured the foot switch pictured in Exhibit 63. *See id.* at 30.[18]

---

**17.** Both parties agree that a plaintiff may prove a manufacturer's identity through sufficient circumstantial evidence. *See O'Donnell v. Big Yank, Inc.,* 696 A.2d 846, 849 (Pa.Super.1997).

**18.** Snyder's testimony on this point was bolstered in part by A–B's own catalog, which advertised the 805–A4, Series D foot switch. *See* Transcript of March 13, 2001, dkt. no. 89, at 30. Snyder stated at trial that the foot

Finally, Snyder compared exhibits 36 and 63 and stated that the photographs depicted the same foot switch. *See id.* In other words, Snyder testified that the foot switch in the first photograph, showing the foot switch as it appeared at the time of Colegrove's accident; was identical to the foot switch in the second photograph, which included the identification tag indicating that A–B had manufactured the foot switch.[19] This evidence at trial thus established, albeit circumstantially, that an A–B foot switch was on the Westvaco machine at the time of Colegrove's accident; that circumstantial evidence was sufficient to permit the case to go to the jury. A–B is therefore not entitled to judgment as a matter of law on this issue.

### III.

■■■■ An alternative motion for a new trial under Federal Rule of Civil Procedure 50(b) is evaluated under the same standards that apply to a motion for a new trial under Rule 59. *See American Bearing Co. v. Litton Industrial Prods., Inc.,* 729 F.2d 943, 948 (3d Cir.1984). A new trial should be ordered if it is necessary to prevent injustice or to correct a verdict that was against the weight of the evidence. *See id.* Any error of law, if prejudicial, is a good ground for a new trial. *See* 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2805 (1995).

A–B raises several issues which it claims require a new trial. First, A–B argues that it should have been permitted to introduce evidence that Westvaco's conduct was a superseding cause of Colegrove's injuries. Second, A–B claims that a statement made by Colegrove's counsel during his closing argument tainted the entire trial. Third, A–B contends that its proposed jury instruction on open and obvious dangers should have been given instead of the instruction on the point which I ultimately gave. Fourth, A–B claims that it was error to allow the jury to view a photograph of the foot switch in question. Fifth, A–B argues that the plaintiff's engineering expert offered a lay opinion that should have been excluded. Finally, A–B contends that the jury weighed several improper considerations in reaching its verdict. I will consider each of these arguments in order.

### A.

I have consistently rejected A–B's arguments that Westvaco was a superseding cause. *See* Memorandum Opinion and Order of March 16, 2001, dkt. no. 77; *supra* Part II.C. My refusal to allow A–B to admit evidence on this issue follows from my earlier conclusion that Westvaco could not be a superseding cause in this case. A–B's argument therefore provides no reason to order a new trial.

switch in Plaintiff's Exhibit 36 was the same as the 805–A4 foot switch advertised in the catalog. *See id.* at 31.

**19.** A–B points out in its Reply Brief, dkt. no. 98, that Colegrove could have proved more directly that A–B manufactured the foot switch in question if he had testified that Plaintiff's Exhibit 63 showed the foot switch as it appeared at the time of his accident. *See id.* at 6. A–B also claims that Colegrove's identification of Plaintiff's Exhibit 36 as depicting the foot switch in question as the one on the machine at the time of his accident is

"useless" because Exhibit 36 does not show any identifying marks on the foot switch. From this, A–B concludes that Colegrove has not shown that it was A–B's foot switch on the machine at the time of his accident. A–B, however, ignores Snyder's testimony that identified Exhibits 36 and 63 as depictions of the same foot switch. This testimony, taken with the other evidence Colegrove introduced at trial, raised an inference that it was an A–B foot switch on the machine, and the jury was entitled to make that inference. A–B's failure to address the most relevant testimony from Engineer Snyder is difficult to understand.

## B.

 A–B next argues that a statement made by Colegrove's counsel during closing arguments effectively tainted the entire trial. In his summation, Colegrove's counsel stated the following:

> What has the defendant told you by way of a valid defense? Well, started out [sic] today by telling you that it is an old foot switch. I believe that Judge Smith may instruct you that it is a completely invalid defense under Pennsylvania law in a products liability case. It doesn't matter that the foot switch was old. It is not a defense to this case.

Transcript of March 14, 2001, dkt. no. 90, at 25.16–22. At a charge conference prior to closing arguments, I had advised counsel that I would not give this proposed instruction. See id. at 2.1–11.25. Colegrove's counsel nonetheless stated that I might give this instruction.[20] Counsel for A–B objected to this statement, but I declined to give the jury an explicit curative instruction on this point. See id. at 35.13–24. A–B now argues that this comment, without any subsequent instruction to cure it, tainted the entire trial and requires that a new trial be ordered.

In the Third Circuit, attorney misconduct will require a new trial when the misconduct "made it reasonably probable that the verdict was influenced by prejudicial statements." Blanche Road Corp. v. Bensalem Twp., 57 F.3d 253, 264 (3d Cir. 1995); Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1236 (3d Cir.1994); Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 207 (3d Cir.1992). The effect of Colegrove's counsel's comment regarding a possible jury instruction must be weighed in the context of the jury charge I actually gave. Those jury instructions must themselves be considered in their entirety. See Ayoub v. Spencer, 550 F.2d 164, 167 (3d Cir.1977).

A–B claims that Colegrove's counsel mischaracterized the defense evidence and incorrectly stated Pennsylvania law. A–B does not explain, however, how there is a reasonable probability that the jury was influenced by Colegrove's counsel's comment. When my jury charge is considered as a whole, it becomes all the less probable that any harm was created by the prejudicial statement here. I made it clear to the jury members that they should consider only my instructions on the relevant law and not any characterizations by counsel. See Transcript of March 14, 2001, dkt. no. 90, at 38–39. More importantly, the inaccurate statement by counsel was more a prediction of how I would instruct the jury than it was an assertion that the age of the foot switch was no defense under Pennsylvania law. An attentive juror who might have been influenced by such a statement of the law would have recognized that I did not charge the jury as Colegrove's counsel suggested I might, and it is probable that the absence of this charge in my jury instructions would have convinced a juror that the age of the product was not a proper issue for consideration, despite Colegrove's counsel's statement to the contrary. Given the inconclusive nature of the comment within the context of my jury instructions as a whole, I cannot conclude that there was a reasonable probability that the jury was influenced by the inaccurate statement. The lack of a curative

---

20. Colegrove's counsel characterizes his statement as "inadvertent," dkt. no. 96, at 19, and A–B's counsel argues in response that it was not. See dkt. no. 98, at 6–7. The inadvertence of the comment is irrelevant to determining whether it was harmful error that requires a new trial, and neither side assists my deliberations by bickering about such side issues. In addition, whether the comment was inadvertent or not does not change the fact that Colegrove's counsel should never have made this statement in the first place.

instruction, even if erroneous, was harmless.

### C.

■ A–B also argues that its version of the jury instruction on known and obvious dangers should have been given instead of the instruction I ultimately provided to the jury. In relevant part, I instructed the jury as follows:

[T]he law does not require a manufacturer or retailer of goods to warn consumers of dangers and hazards which are plain, open and obvious. If you determine from the evidence that the risk of injury from the use of the product was such as would be apparent to an expected user of a product, was widely known and readily recognizable, then you cannot find Allen–Bradley liable on the basis of a failure to warn. If, on the other hand, your finding is that the dangers and hazards were not plain and obvious, then Allen–Bradley was obligated to provide an adequate warning of the dangers and hazards presented by the 805–A4 series D electric foot switch.

Transcript of March 14, 2001, dkt. no. 90, at 50.9–20. A–B claims that instead of this instruction, I should have charged the jury as they proposed, as follows:

A manufacturer owes no duty to warn a user about known and obvious risks. Should you find from the evidence that the alleged defect in the foot switch at issue was not obvious to the people exposed to it, and the plaintiff's alleged injuries would not have been sustained if the defendant had given proper warning of it, you should find for the plaintiff.

However, if you determine that this particular risk was a matter of common knowledge, or that by reason of their particular background, training, and experience, those likely to come into its contact would be well aware of the risks, then any failure of the defendant to warn of such risk cannot be a basis of liability.

Dkt. no. 65, proposed jury instruction no. 26.

■ "A trial judge is not required to adopt the exact wording of a point for charge submitted by counsel." *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 757 (3d Cir.1976); *see also James v. Continental Insurance Co.,* 424 F.2d 1064 (3d Cir.1970). If the jury charge, taken as a whole, accurately instructed the jury, then there is no error in rejecting a party's suggested point for charge in favor of another statement of the applicable law. *See Ayoub,* 550 F.2d at 167. Unless there is some error in the statement of law contained in the charge I gave the jury, my rejection of A–B's proposed jury instruction does not require a new trial.

A–B does not argue that my jury instruction misstated Pennsylvania law. Such an argument would be untenable because my instruction was correct in every respect. *See Fleck,* 981 F.2d at 119–20; *Bowersfield v. Suzuki Motor Corp.,* 111 F.Supp.2d 612, 622–23 (E.D.Pa.2000); *Sherk,* 427 A.2d at 661. Rather, A–B argues that its proposed jury instruction was supported by law. *See* dkt. no. 92, at 16. Even if true, this is beside the point. Unless there is some error in the jury charge I gave, A–B cannot now complain that I did not use their suggested language. Therefore, my rejection of A–B's proposed jury instruction was not an error that requires a new trial.

### D.

■ A–B next contends that I erred in allowing the jury to view a photograph of the paper winding machine and foot switch at issue in this case. Plaintiff's Exhibit 21 was a photograph of the machine, apparently taken two years after Colegrove's

accident. The photograph showed the structure and layout of the machine on which Colegrove worked, including the foot switch. However, by the time the photograph was taken, Westvaco had installed a guard over the foot switch. A–B argues that the guard in the photograph was a subsequent remedial measure, and therefore Federal Rule of Evidence 407 precluded sending this photograph to the jury. At the end of trial, I advised both parties that I would consider sending the jury Plaintiff's Exhibit 21 if the jury asked a question of which this photograph would be probative. Transcript of March 14, 2001, dkt. no. 90, at 61–62. Shortly after it began deliberating, the jury asked to see "the exhibit, enlarged, large photo of the winding machine *showing the position of the foot switch.*" *See id.* at 63.16–17 (emphasis added). I therefore decided to send the photograph to the jury. A–B now argues that it was prejudiced because this subsequent remedial measure raised an inference that A–B should have warned of the danger of using an unguarded foot switch.[21]

Rule 407 bars admission of a subsequent remedial measure if offered to show a design defect or a need for a warning. *See* Fed.R.Evid. 407. The rule does not categorically bar all evidence of subsequent remedial measures, however; it explicitly permits the admission of such evidence if offered for other purposes. *See id.* The jury's request for the photograph clearly implicated something unrelated to the fault of A–B—namely, the location of the foot switch on the paper winding machine. Therefore, this use of the photograph did not run afoul of Rule 407, and there is no

need to order a new trial at which this photograph will be excluded.

**E.**

█ A–B also argues that the opinion given at trial by plaintiff's expert George Snyder should have been excluded because there was no nexus between his expertise in mechanical engineering and the opinion he offered. Snyder was offered and accepted as an expert in the field of mechanical engineering, though without any narrower expertise in a relevant sub-field of mechanical engineering. *See* Transcript of March 13, 2001, dkt. no. 89, at 22. Snyder admitted to having no experience with designing foot switches, and while he had experience with machines using rollers similar to the paper winding machine at issue here, Snyder did not have any specific experience with paper winding machines. *See id.* at 18–19. In the course of his testimony, Snyder gave his expert opinion that the absence of a guard on the foot switch and the lack of warnings regarding the unguarded foot switch were both design defects that caused Colegrove's injuries. *See id.* at 36.

A–B contends that Snyder's lack of specific experience with machines and foot switches like those at issue here rendered his opinion about the design defects that caused Colegrove's injuries nothing more than a lay observation based on common sense. Where opinion testimony will assist the trier of fact, Federal Rule of Evidence 702 permits expert witnesses to offer opinions when the witness is qualified by knowledge, skill, experience, training, or education. *See* Fed.R.Evid. 702. Engineer Snyder holds two degrees in mechani-

---

21. A–B also argues that the photograph raised an inference that the foot switch was defective absent the guard, thereby prejudicing A–B with respect to Colegrove's design defect theory. *See* dkt. no. 92, at 17. However, the jury found in A–B's favor on the design defect theory, so allowing the jury to view the photograph was, at most, harmless error with respect to that theory.

cal engineering from the Massachusetts Institute of Technology. *See* dkt. no. 97, ex. 5, at 4. Snyder has also worked for over 35 years as a mechanical engineer in various fields. *See id.* In some of the various jobs in which he has worked, Snyder has had responsibility for safety requirements and standards in manufacturing plants. *See* Transcript of March 13, 2001, dkt. no. 89, at 14, 44–45. Snyder specifically stated that his expert opinion was based upon a "reasonable degree of engineering certainty." *See id.* at 36. Given his background in mechanical engineering and his work experience, it was fair to conclude that Snyder's opinion regarding the defective condition of the foot switch was helpful to the jury in this case. Snyder's opinion was based upon his own experience and expertise as a mechanical engineer, and it was properly admitted as expert testimony at trial. A–B's argument on this issue therefore fails.

### F.

Finally, A–B contends that the jury decided to award Colegrove the amount of $350,000 based in part on the supposed workman's compensation lien and contingency fee arrangement to which any award would be subject. Notably, A–B cites no evidence of record substantiating this claim, nor is their argument supported by any other evidence. There is nothing more to this argument than counsel's bald assertion, and I therefore find it to be without merit.

22. Prior to trial, I noted my obligation under *Azzarello v. Black Bros., Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978), to decide whether, as a matter of social policy, the risk of loss in this case should be placed upon A–B. Order of March 7, 2001, Dkt. no. 56. I have considered this issue in light of the factors recommended by the Third Circuit in *Surace v. Caterpillar, Inc.,* 111 F.3d 1039, 1046 (3d Cir.1997). I conclude that the risk of loss should be placed upon A–B. The ease with

### IV. Conclusion

Despite the large number of issues A–B raises in its quest for judgment as a matter of law or a new trial, all of their arguments fail to carry the day. A–B was not entitled to a judgment as a matter of law, nor was it prejudiced by any error at trial that would necessitate a new trial.[22]

Accordingly, it is hereby

ORDERED AND DIRECTED this 23rd day of October 2001, that the defendant's Motion for Judgment as a Matter of Law or in the Alternative for a New Trial, dkt. no. 79, is DENIED.

which A–B could have warned of the dangers associated with its foot switch—especially in light of the fact that any such warning could have suggested the alternative, safety guarded foot switches that A–B also manufactured—weighs heavily, as does the potential for the foot switch to cause serious injury when installed on heavy machinery. Social policy dictates that this is an appropriate case in which to assign the risk of loss to the manufacturer.